AD–VANTAGE TELEPHONE DIRECTORY CONSULTANTS, INC.,
Plaintiff-Appellee, Cross-Appellant,

v.

GTE DIRECTORIES CORPORATION,
Defendant-Appellant, Cross-Appellee.

No. 85–3970.

United States Court of Appeals,
Eleventh Circuit.

Aug. 27, 1987.

As Amended Sept. 4, 1987.

---

James J. Kenny, Kenny, Nachwalter & Seymour, Miami, Fla., for defendant-appellant, cross-appellee.

Jawdet I. Rubaii, Atty., Clearwater, Fla., John R. Ferguson, Swidler & Berlin, Washington, D.C., for plaintiff-appellee, cross-appellant.

Before HILL and HATCHETT, Circuit Judges, and HENDERSON, Senior Circuit Judge.

HILL, Circuit Judge:

This case is another poignant illustration of the fact that when business relationships turn sour, the ailing party is apt to turn to the Sherman Act for relief.

### THE FACTS

Appellant, GTE Directories Corp., (GTEDC) is a wholly owned subsidiary of the GTE Corporation. GTEDC enters into contracts with telephone operating companies, including those companies owned by GTE, to publish the telephone company's directory. This lawsuit concerns the directories published by virtue of GTEDC's lawful contract to be the official publisher of the General Telephone Company of Florida's directories for Tampa, Clearwater and St. Petersburg, Florida. GTEDC sells advertising space in these directories; this advertising space is the familiar "yellow pages," containing advertising of businesses with products and services to sell in the community covered by each particular directory.

According to the uncontradicted testimony of John D. O'Neill, former vice president of GTEDC, prior to 1975 Yellow Pages advertising had been coordinated by American Telephone & Telegraph Company (ATT). In May of 1975 ATT, decided to abandon this role, and their coordinating efforts were taken on by the newly formed National Yellow Pages Service Association (NYPSA), which was founded as a self-regulating organization of the publishers of telephone directories. One of the first issues which the NYPSA tackled was the coordination of national advertising. Because each publisher dealt with directories published in specific communities, a national company wishing to place advertisements in many different directories from many different publishers. To ameliorate the logistical problems this situation caused, the NYPSA created the position of Authorized Selling Representative (ASR). According to the NYPSA bylaws and guidelines, an ASR was authorized to sell advertising to any national advertiser on behalf of any publisher within NYPSA. Thus, a national advertiser, such as Grey-

hound Bus Lines, could purchase an advertisement in the directory of every major metropolitan area in the United States and receive only one bill from the ASR with whom it was dealing. It is the responsibility of the ASR to coordinate the advertising, *i.e.*, to contact each publisher about placing an ad. The publisher pays a 25% commission to the ASR for each advertisement placed in its directory.

According to the guidelines published by NYPSA, in order to qualify as "national yellow pages advertising," an advertising package must involve two or more publishers, and be designed to place ads in 20 or more directories in at least three states, with 30% of the advertising revenue generated in states outside the primary state. However, the guidelines go on to say, "this minimum standard does not preclude any member [publisher] from accepting as a yellow pages service ad any advertising program having fewer publishers, fewer directories, or fewer states, than the minimum standard."

The guidelines provide that each publisher will recognize an ASR's national sales, and will pay a commission on those sales. Under the NYPSA guidelines, the publisher in whose directory a national ad is placed bills the ASR for the advertising space, and the ASR is ultimately responsible for payment. The ASR collects from its advertiser clients. Each publisher has the right not to deal with an ASR who fails to pay its bills promptly, or otherwise cannot establish itself as a good credit risk. Many of the publishers of telephone directories are themselves qualified ASR's. At the time the events involved in this litigation took place, GTEDC had a separate department qualified as an ASR for national yellow pages advertising.

Mr. Joel Blumberg is the central figure in this litigation. He was a sales person for GTEDC until 1975 when he started his own business as a "yellow pages consultant" in the Tampa Bay area. In 1979, after NYPSA authorized nonpublisher

ASR's to sell national yellow pages advertising, Blumberg's company, Ad-Vantage Telephone Directory Consultants, Inc. ("Ad-Vantage") became an ASR.[1]

Once in business as an ASR, Mr. Blumberg decided to "discount" yellow pages advertising. He accomplished this by charging his clients less than the publisher's established rate for a yellow pages advertisement. However, Ad-Vantage was still required to pay the publisher full price for the ad. Presumably, the difference between what Ad-Vantage had to pay a publisher and the amount paid by its clients to Ad-Vantage came out of Ad-Vantage's commissions.

GTEDC was apparently concerned about discounting, allegedly because ASR's who failed to charge their clients the authorized rate for yellow pages advertising seemed unable to pay their publisher's bills on time and also provide "full and comprehensive service" to their clients. This concern was expressed in the first issue of "NYPSA News" a newsletter published by GTEDC in May of 1982.

Evidently one of the "discounting ASR's" who did have some problems paying its bills was Mr. Blumberg's company, Ad-Vantage Inc. Mr. Blumberg's own testimony indicated that, at least in the early part of 1982, the company was having to finance some of its clients' accounts by paying the publishers before it received payment from its advertisers.

According to its version of the facts, GTEDC suffered chronic collection problems with Ad-Vantage over a period of two years. The extent of Mr. Blumberg's failure to keep Ad-Vantage's account with GTEDC "current" was hotly disputed at trial. However, it was undisputed that several checks sent to GTEDC by Ad-Vantage had bounced. After extensive contacts with Mr. Blumberg regarding Ad-Vantage's alleged indebtedness to GTEDC, a senior attorney in charge of collections at GTEDC sent a letter directly to the advertisers for whom Ad-Vantage had placed

1. In order to become an ASR, one had to apply, submit credit references, be approved, and pay an application fee of $450.00.

advertisements in the GTEDC directories. The letters, dated May 6, 1982, explained that certain difficulties had arisen between GTEDC and Ad-Vantage; that GTEDC would bill each advertiser directly for its advertising submitted through Ad-Vantage; and that future advertising orders submitted by Ad-Vantage must be accompanied by advance payment, or a guarantee of payment by the advertiser.

Mr. Blumberg was advised of this direct mailing by letter dated May 10, 1982. This letter advised Mr. Blumberg that according to GTEDC's records, his company still owed GTEDC $38,424.06, and that another $122,335 would be due promptly. The letter informed Mr. Blumberg that "when you are able to bring your account to a current status with GTE Directories Corp., we will once again be willing to accept your orders in the normal course of business."

Ad-Vantage claimed that as a result of GTEDC's direct contact with its clients, it lost several major accounts, and ultimately went out of business (to be immediately reborn under the name of National Yellow Pages Directories Services).[2] Accordingly, Ad-Vantage sued GTEDC in federal district court, claiming, *inter alia*, that GTEDC's action violated the Sherman Act and the Florida anti-trust statute, and constituted breach of contract, and tortious interference with business relations under Florida law. GTEDC counter-claimed for $208,000 which it claimed Ad-Vantage still owed on past due accounts.

The case went to trial before a jury, and the jury returned a verdict in favor of the plaintiff, Ad-Vantage, but only on the anti-trust claims brought under the Florida Anti-trust Act, and the tortious interference with business relations claim. GTEDC prevailed on its counter-claim. The jury awarded Ad-Vantage $1.5 million in compensatory damages on the Florida anti-trust claim, and $500,000 in punitive damages on the interference with business relations claim. The antitrust award was trebled, pursuant to Florida law, for a total award of $4,500,000. The court then struck the $500,000 punitive damage claim as duplicative in light of the punitive nature of the treble damages awarded on the antitrust claim.

On appeal, GTEDC claims that the district court erred in not directing a verdict or entering judgment notwithstanding the verdict on the monopolization claims, on grounds that Ad-Vantage failed to offer evidence of a relevant market; that the district court should have directed a verdict or granted J.N.O.V. on the business tort claim because GTEDC's actions were justified under Florida law; that the district court erroneously instructed the jury as to Florida law on tortious interference with business relations; and that a directed verdict or J.N.O.V. should have been entered for GTEDC because Ad-Vantage's evidence on the issue of damages was insufficient. Ad-Vantage cross-appeals, claiming that the district court erred by not adding the $500,000 in punitive damages to the treble damages awarded on the anti-trust claim. It also argues that should this court reverse any part of the verdict in favor of Ad-Vantage, it must also reverse the judgment for GTEDC.

## I. THE ANTI-TRUST CLAIMS

We turn first to GTEDC's arguments regarding the district court's failure to direct a verdict on Ad-Vantage's anti-trust claims. The crux of its argument is that Ad-Vantage failed to prove a relevant market within which a jury could correctly evaluate the effect of GTEDC's actions upon its competition.

Initially, we must note that the jury rendered a verdict for the defendant, GTEDC, on the federal anti-trust claims. GTEDC was found liable only for violating Florida anti-trust law, and only that portion of the Florida Anti-Trust Act of 1980 which tracks Section 2 of the Sherman Act, 15 U.S.C. § 2. Fla.Stat. § 542.19 provides:

**Monopolization; attempts, combinations, or conspiracies to monopolize.—**

---

**2.** In 1982, Ad-Vantage was expelled from the ranks of ASR's by the NYPSA for failure to pay several of its publishers. Mr. Blumberg's new company was readmitted as an ASR, only to be expelled for nonpayment of bills in 1985.

It is unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state.

The Florida Anti-Trust Act further provides, in section 542.32, that:

In construing this chapter, due consideration and great weight [shall] be given to the interpretations of the federal courts relating to comparable federal anti-trust statutes....

In applying this provision, the Florida courts held that the Florida legislature has, in effect, adopted as the law of Florida the body of anti-trust law developed by the federal courts under the Sherman Act. *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*, 457 So.2d 1028 (Fla.App. 1984). Thus, in analyzing this case, we may, and indeed must, apply the federal precedent developed under Section 2 of the Sherman Act.

■ Section 2 (and the comparable Florida statute) present two potential anti-trust offenses: monopolization and attempt to monopolize. To prove monopolization, the Section 2 plaintiff must demonstrate possession of monopoly power in the relevant market, and the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnel Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Dimmitt Agricultural Industries, Inc. v. CPC International Inc.*, 679 F.2d 516 (5th Cir.1983), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1982). To prove an attempt to monopolize a plaintiff must demonstrate that the defendant had a specific intent to accomplish the illegal result, *i.e.*, monopolization, and that there existed a dangerous probability that the attempt would be successful. *Spectrofuge Corp. v. Beckman*, 575 F.2d 256, 276 (5th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). In this circuit a Section 2 plaintiff attempting to prove either completed monopolization or an attempt to monopolize must "provide the jury with

sufficient evidence to permit it to define the relevant geographic and product market." *In re Municipal Bond Reporting Anti-Trust Litigation*, 672 F.2d 436, 441 (5th Cir.1982); *Dimmitt*, 679 F.2d at 525. In proving an attempt to monopolize, the relevant market must be demonstrated in order to show that there was a dangerous probability of monopolization in a relevant market. Thus, both aspects of a Section 2 violation require proof of a relevant market.

■ As in most anti-trust litigation, the relevant market was a subject of hot dispute in this case, and the confusion was exacerbated by appellee's chameleon-like ability to shift the focus of its market analysis between national and local advertising. The relevant market is a question of fact for the jury. *See Dimmitt*, 679 F.2d at 527; *Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 345 (9th Cir.1983), *cert. denied*, 464 U.S. 820, 104 S.Ct. 83, 78 L.Ed. 2d 93. In its motion for a directed verdict, and again in its motion for J.N.O.V., GTEDC maintained that Ad-Vantage failed to demonstrate a relevant market.

In evaluating this claim, we are mindful of the Supreme Court's recent admonition that, "a trial judge must direct a verdict only if, 'under the governing law, there can be but one reasonable conclusion as to the verdict ... if reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). After carefully evaluating all of the arguments made by both parties, and after examining all of the evidence presented on this issue with painstaking thoroughness, we conclude, for the reasons given below, that the district court ought to have granted a directed verdict or J.N.O.V. in favor of GTEDC on the anti-trust claims.

We begin by examining Ad-Vantage's claim that "yellow pages advertising" is a relevant product market. The relevant market is made up of those "commodities reasonably interchangable by consumers for the same purposes." *United States v. DuPont & Co.*, 351 U.S. 377, 395, 76 S.Ct.

994, 1007, 100 L.Ed. 1264 (1955). Ad-Vantage offered sufficient testimony to allow the jury to conclude that advertising in telephone directories is unique. In other words, other forms of advertising, such as advertising in newspapers, consumer magazines, or business publications, was not seen by businesses as a suitable substitute for yellow pages advertising. In addition, the increase in price of yellow pages was not commensurate with increases in the pricing of other forms of advertising.[3] However, we note (for reasons which will become important later in our analysis) that all of Ad-Vantage's evidence dealing with the uniqueness of yellow pages advertising related only to advertising in the "official" yellow pages, *i.e.*, advertising published in telephone directories published under contract with the telephone company operating in a specific geographic area.

Determining the product market is only the first step. The relevant product market must also be accompanied by proof of the relevant geographic market. This is the "area of effective competition" within which the parties operate. *Standard Oil Co. v. United States*, 337 U.S. 293, 299, 69 S.Ct. 1051, 1055, 93 L.Ed. 1371 (1949). Initially, all of Ad-Vantage's anti-trust claims rested upon the fact that GTEDC and Ad-Vantage were both Authorized Selling Representatives of national advertising. Evidence offered at trial indicated that competition for national ad campaigns did take place between GTEDC's national sales force (its own ASR) and Ad-Vantage. As an ASR, GTEDC's national sales force solicited advertising not only for its own telephone directories, but also advertising to be placed in the directories published by other members of the NYPSA. When acting as an ASR, the national sales force for GTEDC earned a commission on the ads placed with other publishers, the same as a nonpublisher ASR would earn.

■ Ad-Vantage originally claimed that GTEDC's actions as an ASR were aimed at destroying competition in two relevant geographic submarkets.[4] The first submarket consisted of the sale and purchase of yellow pages advertising space by businesses qualifying as national accounts situated or headquartered in any community or section of the United States. The second submarket consisted of the sale of national advertising in specific yellow pages directories, published in and for a specific community, such as the directories that GTEDC published for Tampa, St. Petersburg, Clearwater, etc.

The problem with these market definitions soon became evident at trial. Ad-Vantage could muster no proof that GTEDC, as an ASR, had obtained any significant degree of market power in the area of national yellow pages advertising. In other words, while GTEDC as an ASR competed with Ad-Vantage as an ASR for the sale of national advertising, Ad-Vantage could offer no proof that GTEDC had monopolized national advertising or had attempted to monopolize national advertising, either in the nationwide market or as appearing in any given directory. We need reiterate at this point that "national advertising," according to the NYPSA guidelines, meant advertising programs ordering ads to appear in 20 or more different directories, published by two or more different publishers, placed in at least three different states, with 30% of the advertising revenue outside the primary state.

With its national advertising theory rapidly collapsing, Ad-Vantage moved to amend its complaint to conform to the evidence produced at trial. The amendment was allowed, primarily because GTEDC

---

**3.** This lack of substitutability is referred to as a lack of "cross-elasticity" and was first addressed by the Supreme Court in *Times-Picayune Publishing Company v. United States*, 345 U.S. 594, 612 n. 31, 73 S.Ct. 872, 882 n. 31, 97 L.Ed.2d 1277 (1953), where the court used the concept to support its conclusion that advertising in other media was not a close enough substitute for newspaper advertising to be included in the same market. Here we simply use that same concept to support the jury's decision that Yellow Pages advertising was not in the same market as other advertising media.

**4.** Monopolization of a submarket is sufficient to support a Section 2 claim. *See Brown Shoe Co. v. U.S.A.*, 370 U.S. 294, 336, 82 S.Ct. 1502, 1529, 8 L.Ed.2d 510 (1962).

failed to show that it would be prejudiced. Thus, the final market asserted by Ad-Vantage, on which the jury received instructions, was as follows:

Ad-Vantage claims that the relevant market or submarket in this case is the purchase and sale of advertising space in a specific yellow pages directory covering a specific geographic area, for example, Tampa, Clearwater and St. Petersburg. It includes buyers and sellers such as GTEDC directories corporation and authorized selling representatives, wherever located, desiring to purchase advertising space from the publisher, such as GTE directories corporation, of the Yellow Pages directory for any specific geographic area.

The purpose of this amendment was to shift the focus from national advertising to local advertising within the telephone directories produced by GTEDC for the Tampa Bay communities. This was accomplished by switching from sale of "national advertising" to "sale of advertising space." The conclusion that this definition shifted the market focus to local advertising is supported by the fact that the jury found GTEDC liable for violating only the *Florida* antitrust laws. The only distinction between the Sherman Act and the Florida law is that the Florida law does not require an effect on interstate commerce. *St. Petersburg Yacht Charters*, 457 So.2d at 1032. "National" advertising clearly effects interstate commerce; it is designed to promote it.

A local advertisement differs markedly from a national ad. A local ad is bought by a local business and appears only in the directory or directories which serve the same geographic area as the one in which that business operates. For example, a "Mom and Pop" grocery store located in St. Petersburg would buy an advertisement in the St. Petersburg directory. It would have no reason to advertise in all of the major metropolitan areas of the United States. Uncontradicted testimony by NYPSA officials at the trial established that most local advertising is placed by direct contract with the publisher of the local directory.

The NYPSA guidelines do establish that, should a publisher desire, it may accept orders for local advertising from an Authorized Selling Representative and treat such advertising as if it were a national ad. That is, a publisher who receives an order for a local ad from an ASR *may* accept it and *may* pay the ASR who obtained the ad a commission. However, it is clear that it is the individual publisher's prerogative to decide whether or not it will pay a commission to ASRs for placements of local advertising. On the other hand, each publisher is bound by the NYPSA guidelines and bylaws to honor an ASR's placement of a national ad; in that case it must pay the commission.

Counsel for Ad-Vantage explicitly recognized GTEDC's exclusive right to control the sale of local advertising within its publications up until the time that it successfully amended its complaint at trial. In its original amended complaint, Ad-Vantage related that, "coincident with its exclusive publication rights, GTEDC is authorized by the local telephone companies as the exclusive agent for the solicitation of yellow pages advertising from local accounts, *i.e.*, advertisers not qualified as "national accounts," in each locality for which it publishes a directory...." Further, in his opening argument, counsel for Ad-Vantage stated, "GTEDC has the exclusive right to sell what is called local clients." He stated further, "GTEDC, notwithstanding the creation of NYPSA, notwithstanding the creation of ASRs, still reserves to itself the exclusive right to sell all local advertising. Ad-Vantage, Mr. Blumberg, cannot sell advertising to advertisers who do not qualify as national accounts, and he can't give them a price break."

The evidence precipitating Ad-Vantage's change of heart with respect to local advertising came in the form of testimony by two yellow pages advertisers, Peter J. Blank of Home Federal Bank, and Alfred C. Grecco, of Apsco Appliance and TV Centers, for whom Ad-Vantage placed local advertisements with GTEDC. Ad-Vantage apparently received a commission from GTEDC for placement of these ads. In

addition, testimony by a GTEDC official indicated that because GTEDC took orders for more than a million ads a year, it could not stop to make sure that all of them were national rather than local ads. It was simply uneconomical to police the ads placed by ASRs.

Based on the above evidence, Ad-Vantage reasoned that there was really no difference between national accounts and local accounts. Thus, it could be said that Ad-Vantage "competed" with the GTEDC's local sales force for the sale of local advertising. GTEDC published the only directories carrying official yellow pages advertising, and local accounts made up 90% of the advertising in the Tampa GTEDC directory. Thus, counsel for Ad-Vantage argued, GTEDC had a 90% share of the relevant market according to this logic.

On motion for directed verdict, counsel for GTEDC rationally pointed out that Ad-Vantage's new theory of the case meant that GTEDC was being accused of monopolizing its own telephone book. GTEDC's 90% "market share" was nothing more than a reflection of the fact that it had a lawful contract with the telephone company to produce the telephone directory and solicit local advertising for that directory.

In response, counsel for Ad-Vantage added the final gloss to its market theory. Faced with a 90% lawful monopoly,[5] it argued that the publication of the telephone directory was a separate activity from the sale of yellow pages within that directory. In other words, it argued that the lawful power to publish the exclusive directory for a specific geographic area did not give GTEDC the right to be the exclusive seller of advertising space within the directory which it published.

Based on this theory, the court instructed the jury:

GTE Directories Corporation, by virtue of its contract with General Telephone Company of Florida, possesses a lawful monopoly over the product it produces, the official Yellow Pages Directory for the City of Tampa and other communities. That GTE Directories Corporation possesses the power to publish its directories and to set rates for advertising space in those directories is not to be considered by you as evidence of monopoly power, monopolization or an attempt to monopolize.

On the other hand, that lawful monopoly to publish the official yellow pages and to set rates for advertising space in the yellow pages may not be exercised to the end that another activity is monopolized or attempted to be monopolized.

The district court never defined what "another activity" might be in the context of this case. Based on these instructions explaining Ad-Vantage's final version of its market theory, as argued by its counsel in closing arguments, the jury found GTEDC liable for monopolization and attempted monopolization under Florida law.

We must admit that this market theory has a certain superficial appeal. It seems analogous to a typical wholesale/resale monopolization case. In fact, for Ad-Vantage's theory to work, the appropriateness of that analogy is crucial. GTEDC must be viewed as a wholesaler or manufacturer of advertising "space." Ad-Vantage must play the role of retailer of this space. Ad-Vantage sells the space to consumers of yellow pages advertising. While GTEDC's contract with the telephone companies enables it to manufacture the space, it cannot use its manufacturing power as leverage to control another level of activity, *i.e.*, the retail sale of this space. Unless this analogy is justified by the commercial realty existent here, Ad-Vantage's claims *must* fall, because it is not a lawful *competitor* of GTEDC for local advertising; the relevant market is the area of effective *competition*.

*White Directory Publishers, Inc. v. New York Telephone*, 1981–2 Trade Cas. (CCH) ¶ 64, 268 (S.D.N.Y.1981) [available on WESTLAW, DCT database].

---

**5.** It was undisputed that GTEDC had a lawful monopoly to publish the directories, by virtue of its contract with the various telephone companies. This is not a case where a competing publisher sues the "official" publisher. *Cf.*

■ A Section 2 claim can be supported by limiting the market definition to a single level of distribution where a vertically integrated manufacturer uses his dominant position at one level of competitive activity (manufacturing) to eliminate competition at another level (retailing). *See e.g., Spectrofuge,* 575 F.2d 256 at 282; *Eastman Kodak v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Poster Exchange, Inc. v. National Screen Service Corp.,* 431 F.2d 334, 339 (5th Cir.1970), *cert. denied,* 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971). *Becker v. Egypt News Company, Inc.,* 713 F.2d 363 (8th Cir.1983). In these cases, the monopolist is seen as imposing a vertical restraint on intrabrand competition. *See also Paschall v. Kansas City Star,* 727 F.2d 692, 698 (8th Cir.1984), *cert. denied,* 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (legitimate business reasons for vertical integration will negate antitrust liability in the absence of "dirty tricks.")

■ However, the superficial similarity between this case and the vertical restraint cases cited above fails when the commercial reality of GTEDC's local advertising sales is carefully examined. To the extent that the sale of yellow pages advertising is an activity separable from the publishing of that advertising the sales made by non-GTEDC ASR's are in the nature of an agency and not retail sales.

The wholesale/resale analogy falls for several reasons. First, there is no "resale." Yellow pages is not a product that is produced and distributed. The blank yellow pages do not exist prior to the sale of an advertisement, somehow awaiting distribution on a resale market. Each advertisement, that is, the space for the ad, is "created" when the advertisement is sold to the advertiser. A GTEDC official testified that publishers will make the yellow pages as large as is necessary to accommodate all of the advertisements placed in it. ASRs do not maintain an inventory of ad space to be sold. An ASR cannot purchase a page in the yellow pages and then distribute it to advertisers as it sees fit.

Thus, the market structure at issue here is quite different from the wholesale/retail schemes used to support Section 2 claims in the cases cited by Ad-Vantage. In *Poster Exchange,* 431 F.2d 334, the defendant was a manufacturer who made a bona fide sale of its products to its distributors, who then sold the products to the consumers. In *Heatransfer Corp. v. Volkswagenwerk,* 553 F.2d 964 (5th Cir.1977), *cert. denied,* 420 U.S. 929, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), the defendant was accused of using its power over one product, the manufacture of Volkswagens, to control the sale of airconditioning units for those Volkswagens, when four different companies were producing air conditioning units for use in Volkswagen cars. In *Becker v. Egypt News,* 713 F.2d at 363, the defendant was accused of using its power in the wholesale market to control the retail market for the Daily Racing Form. However, the daily racing form was a commodity, produced and sold to the retailer, who assumed all the risks of distribution.

The failure of the wholesale-resale analogy is further illustrated by comparison to Sherman Act Section 1 resale price maintenance cases. In a typical price maintenance case, a manufacturer produces a product, and sells it to a retailer. The manufacturer then attempts, in some way, to control the price that its retailer can charge for the product. Retail price maintenance is considered per se illegal under the Sherman Act. *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). It applies where the risks of distribution are borne by otherwise independent firms in competition with each other. *Green v. General Foods Corp.,* 517 F.2d 635 (5th Cir.1975), *cert. denied,* 424 U.S. 992, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976).

In some cases, however, an activity which looks like resale price maintenance is held not to fall within that category because the relationship between the parties is not that of wholesaler-retailer. The pivotal case establishing this doctrine is *Unit-*

ed States v. General Electric Company, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), which held that a genuine agency or consignment relationship falls outside the per se rule of *Dr. Miles*. Thus, in General Electric the Supreme Court found that General Electric's patent on the light bulb it manufactured resulted in a consignment rather than a wholesale/resale relationship with its "distributors." Similarly, in *Hardwick v. Nu-Way Oil Co.*, 589 F.2d 806 (5th Cir.1979), we found that where service station operators, "were little more than salaried conduits to enable Nu-Way Oil to make retail sales directly to the consumer," resale price maintenance was not at issue. *See also Green v. General Foods*, 517 F.2d at 635 (per se prohibition on resale price maintenance prohibits such where the risks of the distribution process are born largely by numerous otherwise independent individuals or firms in competition with each other for sale of a product). The implicit assumption behind all these cases is there can be no antitrust violation without a competitor, and agents do not compete with those whom they represent.[6]

We find a recent case from the Seventh Circuit to be particularly instructive in analyzing the Yellow Pages market. In *Illinois Corporate Travel, Inc. v. American Airlines*, 806 F.2d 722 (7th Cir.1986), McTravel sued American Airlines for American's refusal to allow McTravel to write tickets good for travel on American. American admitted that it refused to allow McTravel to sell tickets on American because McTravel would not agree by contract to refrain from advertising discounts. McTravel wanted to let people know that it would rebate part of its usual 10% commission from American to the consumer should a traveler book his or her flights through McTravel.

American's policy was functionally a price restriction. However, the district court declined to issue a preliminary injunction based on a resale price maintenance claim because it concluded that McTravel and other travel service companies are agents of the airline companies. The court of appeals affirmed the district court's decision, concluding that "travel service operators cannot resell air travel." This decision was based on the following findings. An air carrier establishes the price for its tickets and announces that price to the public; it determines the numbers of flights and the destinations of each; a traveler has a choice between dealing directly with the airline or through a travel agent, but the travel agent must obtain the airline's clearance to make a reservation. The travel agent does not purchase an inventory of seats. Travelers receive the service they have paid for directly from the airline; and, although a travel agent may lose his commission when a ticket is not used, the risk of unfilled seats remains at all times with the airlines. *Id.* 806 F.2d at 725.

We find this analogous to the relationship between an ASR and a yellow pages publisher. The publisher lawfully establishes the price for its advertising and announces it to the public. It determines when it is going to publish directories, and has the ultimate say on how many advertisements it will accept. An advertiser may deal directly with the publisher, or may use an Authorized Selling Representative. However, should it use an ASR, the ASR must submit a request for advertising to the publisher, analogous to a reservation in the forthcoming publication. The ASR does not purchase an inventory of yellow pages space. The service which the advertiser has paid for is performed by the publisher, not the ASR. Further, should the advertisement fail to appear as requested in the appropriate directory, the publisher is under an obligation to refund the advertiser's money. Finally, should a publisher not receive enough advertisements to make a directory profitable, it must still publish the directory; the publisher retains the "risk" that not enough yellow pages advertisements will be "distributed"—not the ASRs.

6. The Supreme Court has made clear that a dual-distribution system dressed to look like an agency will not escape the reach of the Sherman Act. *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). Such is not the case here.

The record in this case is replete with evidence that an Authorized Selling Representative functions as an agent, not a retailer. The NYPSA guidelines provide that, "in any case where a difference arises between an advertiser and the publisher, [the ASR] represents the publisher's interest." The application for ASR status states that, "the undersigned further understands that when selling National Yellow Pages advertising to national advertisers or their advertising agencies, or when negotiating disputes with such national advertisers or their advertising agencies, it is representing the publishers who are members of this association...." Finally, the executive director of the National Yellow Pages Association, Fred Smykla, testified that an ASR represents the publisher in all things that the publisher does, and is expected to act in the publisher's best interests.

There is some evidence in the record to indicate that an ASR, when purchasing advertisements on behalf of an advertiser, is acting as the agent of the advertiser. For example, letters from GTEDC to Ad-Vantage's client referred to Ad-Vantage as the advertiser's agent. Also, should the advertiser fail to pay the ASR through whom it purchased yellow pages advertising, that ASR is still liable to the publisher for payment. However, this does not establish that a dual distribution system existed; it merely means that all advertising was purchased directly from the publisher, and that the advertisers who dealt through an ASR had an agent acting on their behalf. Either way, an ASR functions as an agent, not an "independent contractor," and not, in any case, as a retailer of yellow pages advertising space. There was simply no evidence presented which would allow a reasonable jury to reach the latter conclusion, a conclusion essential to Ad-Vantage's market theory. Thus, Ad-Vantage's leveraging argument fails. There was no "second activity" monopolized by using GTEDC's lawfully acquired market power to publish telephone directories as leverage.[7]

Once the market structure is thus clarified, we can distinguish this case from the most relevant former fifth circuit precedent, *Six Twenty-Nine Productions v. Rollins Telecasting, Inc.*, 365 F.2d 478 (1966). In that case, a television station with a lawful local monopoly decided to expand its in house advertising agency services. That is, in addition to selling air time, it began producing television advertisements and receiving additional remuneration for these services from its advertiser clients. When Six Twenty-Nine Productions, a local advertising agency, attempted to place advertisements with the station, a station representative informed the agency that it would not pay Six Twenty-Nine a commission, and that the station had "set aside $1,000,000 to put the agency [Six Twenty-Nine Productions] out of business." When Six Twenty-Nine Productions sued the television station under the Sherman Act, the station defended on the ground that it had the absolute right to refuse to deal with a competitor under *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The court of appeals disagreed, finding that Six Twenty-Nine stated a cause of action based on the idea that the television station, "used [its] legal monopoly power to create monopoly power in a

---

**7.** The only other court to handle a similar Yellow Pages case, of which we are aware, came to the same conclusion. In *Best Advertising v. Illinois Bell Telephone Company*, 229 F.Supp. 275 (S.D.Ill.1964), *aff'd*, 339 F.2d 1009 (7th Cir. 1965), Illinois Bell published its own directory. The Reuben H. Donnelly Company had a contract to serve as the exclusive sales representative for the Bell Yellow Pages in Illinois. Best Advertising submitted advertising for some of its clients to Donnelly for inclusion in one of Bell's directories. Donnelly refused to accept the advertising, and Best Advertising sued, claiming violations of the Sherman Act. The district court dismissed the case for failure to state a claim, noting, *inter alia*, that "it is apparent upon the face of the complaint that neither of the parties is in competition with either of the other parties, thus, Donnelly's refusal to deal with the plaintiff does not have any tendency whatsoever to stifle competition." *Id.* 229 F.Supp. 277. The court of appeals affirmed without addressing this issue, however, holding that the plaintiff failed to show an impact on interstate commerce. *Best*, 339 F.2d at 1012. Coincidentally, the plaintiff in *Best* also claimed to offer Yellow Pages advertising to its clients at a "substantial savings."

separate but related field...." *Id.* 365 F.2d at 483.

Thus, in *Six Twenty-Nine Productions,* a leveraging argument was possible. The production of advertisements is a related activity separate from the sale of advertising space. Each is a separate source of revenue. In the context of this case, no evidence was presented indicating that ASRs do not receive separate compensation from their clients when the ASRs engage in the production—the lay out—of the advertisements. In fact, testimony of a former NYPSA official indicated that *most* of the national yellow pages advertising is purchased through ASRs by advertising agencies on behalf of national advertisers, supporting the notion that ad agencies perform a separate function. Thus, the leveraging argument made in *Six-Twenty-Nine Productions* is not available here.

A clear view of the yellow pages market structure also obviates application of the case most heavily relied upon by Ad-Vantage, that being *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). In *Aspen,* the Supreme Court held that a monopolist may not refuse to deal with a competitor where that refusal is designed to impede competition and is not based on legitimate business reasons. *Aspen,* by its terms, applies in a situation where there is *competition* and *competitors.*[8] Here, where Ad-Vantage could prove that GTEDC and Ad-Vantage competed, *i.e.,* in the sale of national advertising, it could not prove that GTEDC was a monopolist. Where Ad-Vantage could prove that GTEDC was a "monopolist," *i.e.* in the sale of local advertising in its own directory, it could not demonstrate that Ad-Vantage *competed* with GTEDC. In order to demonstrate "an area of effective competition"

one must establish a competitive relationship. Ad-Vantage failed to do so.

Ad-Vantage insists that although GTEDC had the exclusive right to solicit local advertisements, the fact that Ad-Vantage was able to slip in a local ad and receive its commission meant that a *de facto* two-tiered distribution system had been established. We disagree. First, as noted above, all the evidence in the record indicated that Ad-Vantage was an agent, either for GTEDC or the advertiser. Second, taken to its logical extreme, Ad-Vantage's position would mean that wherever an agent makes an unauthorized sale, a competitive relationship is established such that the principal's refusal to deal with that agent could result in anti-trust liability.[9] As confusing and convoluted as anti-trust law may seem, we refuse to add this new twist. We therefore hold that the district court erred in refusing to grant J.N.O.V. for GTEDC due to Ad-Vantage's failure to demonstrate a relevant geographic market.

## II. THE TORT CLAIM: JUSTIFICATION

■ Next, GTEDC argues that the district court should have granted its motion for a directed verdict or for judgment notwithstanding the verdict on Ad-Vantage's claim of tortious interference with its business relationships. Ad-Vantage's claim was based on GTEDC's direct contacts with its clients, and subsequent direct billing of Ad-Vantage's clients for their advertising placed in GTEDC's directories.

We find the record sufficient to support the jury's verdict on this issue. In order to prove tortious interference with advantageous business relations under Florida law, the plaintiff must demonstrate (1) the existence of a business relationship under which

---

**8.** The *Aspen* case involved the operators of ski resorts in the Aspen, Colorado region, who competed with each other for customers. Each offered potential skiers different services, *i.e.,* the opportunity to ski at different resorts. It was uncontested on appeal in *Aspen* that the parties were competitors in a relevant geographic market. *Aspen,* 105 S.Ct. at 2856, n. 26.

**9.** Nor do we find Ad-Vantage's argument that "every local advertiser is a potential national account" to be persuasive. The NYPSA guidelines establish a distinction between national and local advertising. An ASR does not "compete" for local ads: it places them with GTEDC's permission. ASRs may contact local advertisers to see if they can drum up interest in national advertising, but this does not change the market structure.

the plaintiff has legal rights; (2) an intentional and unjustified interference with the relationship; and (3) damage to the plaintiff as a result of the tortious interference with that relationship. *See G.M. Brod & Company, Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1534 (11th Cir.1985); *Elhel Corp. v. Balter*, 386 So.2d 1220, 1223 (Fla. App.1980), *cert. denied*, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981).

Appellant's argument focuses on its justification defense; it argued that its conduct was thoroughly justified. However, Ad-Vantage presented evidence which indicated that, at least according to some accounts, Ad-Vantage could have been deemed "current" in its financial obligations to GTEDC as of May 6th; that GTEDC had not specifically reserved a right to bill Ad-Vantage's clients directly; that it was not the usual practice within the NYPSA for a publisher to directly bill an ASR's clients; and that GTEDC chose a particularly devastating way to obtain its money from Ad-Vantage—a way calculated to damage Ad-Vantage's business relationships. The fact that GTEDC prevailed on its counter-claim gives credence to its argument that Ad-Vantage was not, at least at the commencement of the litigation, paying its bills promptly. However, even if Ad-Vantage did owe GTEDC money, the jury was entitled to find that the particular manner in which GTEDC chose to collect its bills tortiously interfered with Ad-Vantage's business relationships. We therefore affirm the district court's denial of J.N.O.V. on this claim.

## III. THE COURT'S INSTRUCTIONS ON TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

GTEDC also claims that the district judge incorrectly instructed the jury on the Florida law regarding tortious interference with advantageous business relations. Appellant challenges the instructions in two ways. First, GTEDC contends that the court's refusal to use its requested instruction No. 38 constituted reversible error. Second, the appellant argues that the court erred in instructing the jury that GTEDC

was required to prove "that its interference, if any, with Ad-Vantage's business relationships was necessary and was not unlawful...." GTEDC claims that this instruction "virtually guaranteed a verdict against GTEDC."

GTEDC's requested instruction 38 explained three detailed ways whereby GTEDC might be justified in contacting Ad-Vantage's clients directly. First, the instruction explained that if the jury found that GTEDC had a contractual right to direct bill Ad-Vantage's clients then its conduct was justified. Second, the instruction stated that if the jury found that GTEDC believed, in good faith, that it had a legal right to directly bill Ad-Vantage's clients, and further believed that its own interests would be impaired if it did not take that action, then the jury should find for GTEDC. Finally, the requested instruction explained that if the jury found that GTEDC acted to protect an existing economic interest of its own and that the means employed to protect that interest were lawful, then the jury should find for GTEDC. GTEDC maintains that it was entitled as a matter of law to have the trial judge advise the jury of its claims and theories of the law, as expressed in instruction No. 38.

It is true that a litigant is entitled to have the jury instructed on its theory of the case, if there is any competent evidence to support the theory, and if the instruction is properly requested. *Corey v. Jones*, 650 F.2d 803, 807 (5th Cir.1981); *Don Burton, Inc. v. Aetna Life & Casualty Co.*, 575 F.2d 702, 706 (9th Cir.1978). However, the court is not required to give instructions in the exact language that a party's lawyer desires. A judge has "considerable latitude in the choice of language used to convey to the jury in a clear and correct fashion the applicable law." *Delancey v. Motichek Towing Service, Inc.*, 427 F.2d 897, 902 (5th Cir.1970); *see also Pesaplastic C.A. v. Cincinnati Milacron*, 750 F.2d 1516, 1525 (11th Cir.1985).

We find that in this case the jury was sufficiently instructed that justification was a defense to tortious interference

with business relations. In fact, the justification instruction that was given was requested by the defendant. The court explained to the jury that justification could shield GTEDC from liability, and that the jury's determination of whether GTEDC's conduct was justified would turn on the balancing of relevant factors. These factors included the nature of GTEDC's conduct; GTEDC's motive; the character of Ad-Vantage's expectancy with which the conduct interfered; the relationship among Ad-Vantage, the third-parties involved and GTEDC; the interest sought to be advanced by GTEDC; and the social desirability of protecting Ad-Vantage's expectancy versus preserving GTEDC's freedom of action. The court also instructed, "the law generally deems a circumstance to be effective as a justification if GTEDC has acted in the exercise of a right equal or superior to that of Ad-Vantage, so long as the means employed are lawful."

It is clear that all of the factors which are set out in specific factual detail in the refused instruction, no. 38, were given, albeit in a more generalized form. The given instructions showed, "no tendency to confuse or to mislead the jury with respect to the applicable principles of law." *Rohner, Gehrig & Company v. Capital City Bank,* 655 F.2d 571, 580 (5th Cir.1981). We find no error.

▮ GTEDC also argues that the judge's use of the word "necessary" altered the meaning of the instructions such that they no longer reflected applicable law. With regard to this contention, we hold that GTEDC failed to preserve its objection. Use of the word "necessary" was not discussed during the charge conference. This is plainly the type of allegedly erroneous instruction to which counsel must object at the appropriate time in order to give the district judge an opportunity to review and correct the error, if any. Fed.R.Civ.P. 51; *Bush v. Carpenter*

*Bros., Inc.,* 447 F.2d 707, 712 (5th Cir.1971). Counsel for GTEDC did not voice an objection to this instruction at the appropriate time. Thus, it may not challenge use of the word "necessary" on appeal.[10] We thus affirm the jury's verdict finding GTEDC liable for tortiously interfering with Ad-Vantage's business relations.

## IV. SUFFICIENCY OF THE EVIDENCE WITH RESPECT TO DAMAGES

▮ As noted above, the jury awarded Ad-Vantage $1.5 million in compensatory damages. There was not a separate compensatory damage award for the anti-trust claim and a separate compensatory award for the business tort. Ad-Vantage claimed that the single series of acts, *i.e.,* billing its clients directly, constituted both an anti-trust violation and a business tort. Thus, the $1.5 represents the total compensatory award. In view of our reversal of the antitrust claim, this award must be completely supportable under Florida tort law before it may be affirmed.

GTEDC contends that the evidence used to support the damage award was insufficient. To prove damages, Ad-Vantage offered a damage study, wherein their economic expert isolated (after three tries) the accounts which Ad-Vantage claimed were lost due to GTEDC's actions. He then attempted to prove the present value of the profits that Ad-Vantage would have made on these specific accounts had they not been lost due to GTEDC's interference.

GTEDC argues that the damage estimate was inadequate in several respects. First, it argues that Ad-Vantage did not establish that the accounts were lost because of any actions by GTEDC. Second, GTEDC argued that the figures used to determine future expenses and future profits were purely speculative. Third, GTEDC argued that Ad-Vantage's economic expert erred

---

**10.** In its reply brief GTEDC attempts to argue that its objections regarding the court's failure to instruct the jury that the existence of malice is relevant to a tortious interference with business relationship claim covers the same territory as an objection to the word "necessary." We

do not see that malice is related to necessity. Moreover, the record does not reflect, either in the charge conference, or the motions filed post-judgment, that GTEDC was unhappy with the court's final instruction (or lack thereof) with respect to malice in the tort context.

by adding future lost profits to future going concern value. Finally, to the extent the damage figure represented compensation for losses attributable to the tort claim, GTEDC argues that the net profit figure offered by Ad-Vantage was insufficient under Florida law because Ad-Vantage failed to account for the large sums of money withdrawn by Mr. Blumberg from Ad-Vantage as personal income.

We find GTEDC's first argument to be without merit. At trial Ad-Vantage produced evidence sufficient to demonstrate that GTEDC's contact with Ad-Vantage's clients precipitated the loss of specific accounts. For example, Mr. Blank of Home Federal Bank testified that his bank left Ad-Vantage because of GTEDC's correspondence. Similarly, Mr. Tamburri, a former salesman for Ad-Vantage, testified that he left Ad-Vantage, and took specific accounts with him, because he felt that GTEDC was going to "sink the ship." Conflicts in the evidence regarding whether or not Ad-Vantage's final version of its damage study included only those accounts lost due to GTEDC's conduct were correctly left for the jury to resolve. *See Graphic Products Distributors v. Itek Corp.*, 717 F.2d 1560, 1578 (11th Cir.1983) (where jury's determination of causality is adequately supported in the record J.N.O.V. inappropriate).

Nor do GTEDC's second and third arguments tarnish the jury's verdict. All of the arguments that GTEDC makes concerning amount of expenses appearing in Ad-Vantage's damage study were made to the jury, and the jury had before it the data necessary to evaluate those challenges. Similarly, the argument that GTEDC makes regarding the capitalization figures was effectively made on cross-examination, and the economic consequences of that argument were readily apparent to the jury. The jury seemed to recognize that Ad-Vantage's expert witness had been substantial-ly discredited, for it awarded Ad-Vantage less than half of the compensatory damages it claimed. But the argument that GTEDC makes regarding Mr. Blumberg's income has merit, and renders the jury's verdict insufficient as a matter of Florida law.

To recover anticipated lost profits in Florida, a plaintiff must demonstrate such a loss with reasonable certainty by competent proof. *Polyglycoat Corp. v. Hirsch Distrib., Inc.*, 442 So.2d 958, 959 (Fla.App.), Pet. for Review Dismissed, 451 So.2d 848 (Fla.1984); *Wash Bowl Inc. v. Wroton*, 432 So.2d 766, 787 (Fla.App.1983). The expenses incurred to produce the net profits must be established in specific dollar amounts. *E.T. Legg & Associates v. Shamrock & Auto Rentals, Inc.*, 386 So.2d 1273, 1274 (Fla.App.1980); *American Motorcycle Institute, Inc. v. Mitchell*, 380 So.2d 452 (Fla.App.1980); *Ballard v. Krause*, 248 So.2d 233 (Fla.App.1971).[11] In addition, Florida law expressly requires that a corporation, in proving the amount of lost profits, must deduct the expense of salaries paid to its officers.

The strictness of this last rule was made clear in *Southern Bell Telephone & Telegraph Co. v. Kaminester*, 400 So.2d 804 (Fla.App.1981), wherein the third district court of appeals applied it to a physician who had incorporated his private practice. The court reasoned:

> A practitioner who incorporates should not be allowed to enjoy the benefits of the corporate form, then, because it would be economically advantageous to the practitioner in a suit brought by the corporation seeking damages, be free to disregard that corporate form. We hold that the failure to deduct the compensation of Dr. Kaminester in the computation of net profits, rendered the proof of damages inadequate as a matter of law, and that the court erred in not granting Southern Bell's motion for a new trial.

---

11. The plaintiff's burden regarding proof of lost profits is not as strict under federal anti-trust law. *See Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 45 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *Malcolm v. Marathon Oil*, 642 F.2d 845, 858 (5th Cir.), *cert.* denied, 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981); *Graphic Products*, 717 F.2d at 1580 n. 38. However, given that we have now reversed the anti-trust award, the compensatory damages must stand on its own under Florida tort law.

Ad-Vantage's damage study did not deduct any salary or compensation for Mr. Blumberg. Ad-Vantage attempts to justify its circumvention of this rule by arguing that it is inapplicable to a subchapter S corporation. It bases this argument on dicta found in *Ed Skoda Ford, Inc. v. P & P Paint Body Shop, Inc.*, 277 So.2d 818 (Fla.App.1973), *cert. denied*, 315 So.2d 179 (Fla.1975). There, the court applied the above rule, and held that an estimate of lost profits that did not take account of officer's salaries was inadequate as a matter of law. The court did state that Ed Skoda Ford, Inc. was not a subchapter S corporation. However, the court offered no explanation for why the status of a corporation for federal income tax purposes would have been relevant in carving out an exception to the rule that officers' salaries must be counted as an expense.

An analysis of what subchapter S status involves reveals that Ad-Vantage's argument has no merit. The subchapter S form is available to small corporations which meet the requirements set out for such corporations. In a subchapter S corporation, the income of the corporation is treated as personal income of the stockholders. 26 U.S.C. § 1371. In this way the corporation avoids the corporate "double tax," whereby the corporation is first taxed on its income, and then the individual stockholders are taxed on their stock dividends. Thus, as Ad-Vantage correctly points out, where the only compensation paid to a stockholder of an subchapter S corporation is that amount which represents the corporation's net profits, that income could not be subtracted as an expense, because such a procedure would always produce a net profit of zero.

However, such is not the case with Ad-Vantage, because Mr. Blumberg's "income" showed no relationship to Ad-Vantage's established net profits. The only year for which Ad-Vantage attempted to show actual profits produced by the lost accounts was 1982. In that year, Joel Blumberg's K–1 form indicated that he received $448,984 as income in 1982 by virtue of his status as sole shareholder of Ad-Vantage. There was no evidence at trial to indicate that this figure represented Ad-Vantage's net profits for 1982. In fact, Mr. Blumberg's testimony indicated that he drew money out of Ad-Vantage's account when he needed it "to live on." He also testified that in 1982 more than $100,000 of the $448,984 which showed up as income on his K–1 form for 1982 was taken directly out of Ad-Vantage's corporate account to pay for his personal losses in the commodities market. While he did state that "most" of that $448,000 which was declared as income on his tax form was used to purchase certificates of deposit, in his own name, as security to guarantee letters of credit for Ad-Vantage, no evidence was offered to indicate what amount of the $448,984 declared as income to him was represented as expenses on the damage study used to show lost profits. Florida law requires that expenses producing loss profits be established in specific dollar amounts. *E.T. Legg*, 386 So.2d at 1274.

In actuality, Mr. Blumberg wore two hats. As manager of Ad-Vantage, he earned a salary. The salary was flexible, it was up to him to determine how much, but it represented money taken out of the corporation without regard to the actual profit that the corporation, *i.e.*, Mr. Blumberg as shareholder, was making. Had Ad-Vantage been able to show that Mr. Blumberg's withdrawals were related to the amount that he expected Ad-Vantage to produce in net profits in 1982, the subchapter S argument might hold water. However, the argument that Ad-Vantage makes would allow a corporate officer to drain a corporation dry; use all of its capital to pay personal gambling debts; and then claim that, because he was the sole shareholder, the corporation was operating at a profit.[12]

■■■ "Our task is to insure that the jury rendered a just and reasonable estimate based on relevant data." *Construction*

---

12. Ad-Vantage also argues that its failure to include Mr. Blumberg's income as an expense is made up for by the fact that its damage study generously apportioned Ad-Vantage's total expenses to production of profit on the lost accounts. This is irrelevant. Mr. Blumberg's salary must be prorated as an expense. The fact that Ad-Vantage claimed to be conservative in assessing its damages does not allow it to ignore Florida law.

*Aggregate Transport, Inc. v. Florida Rock Industries, Inc.,* 710 F.2d 752, 786 (11th Cir.1983). The law of Florida makes the exact amount of Mr. Blumberg's salary, to the extent it differed at all from Ad-Vantage's net profits, a relevant factor. While we cannot say that Ad-Vantage failed to prove that it was damaged at all, the evidence was insufficient to justify the jury's verdict.[13] Thus, we must remand for a new trial on the amount of damages sustained as a result of GTEDC's tortious interference with Ad-Vantage's advantageous business relations.

## V. AD-VANTAGE'S CROSS-APPEAL

As noted above, the district court deleted the $500,000 awarded to Ad-Vantage as punitive damages stemming from the tort claim. The court held that Ad-Vantage could recover its compensatory damages, times three, under the Florida Anti-Trust Act, or, should that claim not be sustained on appeal, then the plaintiff could recover its $1.5 million compensatory damages plus $500,000 in punitive damages.

Given our disposition of the above claims, this issue is moot.[14] Because the anti-trust claim no longer stands, Ad-Vantage is no longer entitled to treble damages; however, the punitive damage award may stand, providing that the jury on remand determines that Ad-Vantage is entitled to at least nominal damages. Under Florida law, "the establishment of liability for a breach of duty will support an otherwise valid punitive damage award even in the absence of financial loss for which compensatory damages would be appropriate." *Lassiter v. Intern. Union of Operating Engineers,* 349 So.2d 622, 626 (Fla.1977); *Moore v. Dugger,* 504 So.2d 493 (Fla.App. 1987).

Ad-Vantage also claims that GTEDC's counter-claim should rise or fall with the anti-trust claims. Ad-Vantage asserts that the jury arrived as some sort of equitable adjustment by awarding GTEDC some money in the face of a large damage award to Ad-Vantage. We disagree. There is no necessary connection between the two awards. The jury determined that Ad-Vantage had not paid its bills, and that GTEDC deserved the money that it sued for. It also determined that GTEDC's method of attempting to collect the money constituted tortious interference with Ad-Vantage's business relations. There is no reason that the claims should rise or fall together. The jury's award on the counterclaim in favor of GTEDC is affirmed.

To conclude, the jury's award on the anti-trust claim is reversed and remanded with instructions for the district court to enter J.N.O.V. in favor of GTEDC on all the anti-trust claims. The jury's finding of liability on the tortious interference with business relations claim is affirmed; however, the issue is remanded for trial to determine an appropriate amount of compensatory damages. The final disposition of the punitive damage claim stemming from tortious interference is remanded to the district court, to await the outcome of the compensatory damage issue. Ad-Vantage's cross appeal regarding punitive damages is dismissed as moot, and GTEDC's award on its counterclaim is affirmed.

AFFIRMED in part; REVERSED in part; and REMANDED in part for further proceedings consistent with this opinion.

---

**13.** A directed verdict on the amount of damages is proper only in the most unusual circumstances. *Malcolm v. Marathon Oil,* 642 F.2d 845, 858–60 n. 24 (5th Cir.1981), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113. Even where a district court's refusal to instruct the jury on lost profits is not appealed, the failure of the plaintiff to establish such profits "with reasonable certainty by competent proof" under Florida law is grounds for a new trial on that issue where the appellant challenges the sufficiency of the evidence. *T.D.S. Inc. v. Shelby Mutual Ins. Co.,* 760 F.2d 1520, 1533 n. 14 (11th Cir.1985), *reh gr. in part, mod. on other grounds, reh. den. in part, T.D.S., Inc. v. Shelby Mut. Ins. Co.,* 769 F.2d 1485 (11th Cir.1985).

**14.** Contrary to Ad-Vantage's assertions, the Eighth Circuit has decided that treble damages on an anti-trust count and punitive damages on a state law count are duplicative. *Super Turf, Inc. v. Monsanto Co.,* 660 F.2d 1275 (8th Cir. 1981). Given our disposition of the case we decline to address the issue at this time.