**ILLINOIS CORPORATE TRAVEL, INC., d/b/a McTravel Travel Services, Plaintiff-Appellant,**

v.

**AMERICAN AIRLINES, INC., Defendant-Appellee.**

**No. 86–1201.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1986.

Decided Nov. 19, 1986.

David M. Stahl, Isham, Lincoln & Beale, Chicago, Ill., for plaintiff-appellant.

Steven C. McCraken, Gibson, Dunn & Crutcher, Newport Beach, Cal., for defendant-appellee.

Before BAUER, Chief Judge, and FLAUM and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

American Airlines does not allow McTravel Travel Services to write tickets good for travel on American, because McTravel will not agree by contract not to advertise discounts. McTravel wants to let people know that it will rebate part of a travel agent's usual 10% commission. American's policy is functionally a price restriction. See *United States v. Gasoline Retailers Ass'n*, 285 F.2d 688 (7th Cir. 1961); cf. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 649, 100 S.Ct. 1925, 1928–29, 64 L.Ed.2d 580 (1980). This led to McTravel's claim that American has violated the *per se* prohibition against resale price maintenance established by *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 404–09, 31 S.Ct. 376, 383–85, 55 L.Ed. 502 (1911), and reaffirmed in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 102–03, 100 S.Ct. 937, 941–42, 63 L.Ed.2d 233 (1980). See also *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 n. 7, 104 S.Ct. 1464, 1469–70 n. 7, 79 L.Ed.2d 775 (1984).

The district court declined to issue a preliminary injunction, however, concluding that plaintiff McTravel and other "travel service companies" are genuine agents. Ever since *United States v. General Electric Co.*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), the agency relation has been outside the *per se* rule of *Dr. Miles*. The district court thought that *General Electric* doomed most of McTravel's antitrust arguments as a matter of law. The only possible exception, according to the district court, would arise if there had been "concerted action between American and some of its agents to put McTravel out of business." After reviewing evidence on this score, the district judge concluded that there was no direct support for a conspiracy; as for the inference of a conspiracy, the district court wrote: "The conspiracy evidence (on the present record) is weak." The court then concluded that McTravel would not suffer sufficient irreparable harm pending a trial on the merits to justify an injunction in the face of its "weak" case on the merits.

Because a district court has substantial discretion to evaluate the "equity" factors in passing on motions for preliminary injunctions, see *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir.1986); *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589 (7th Cir. 1986); McTravel has devoted most of its effort on appeal to an argument that the district court incorrectly assessed its probability of success on the merits. It seeks to bring the case within a rule of *per se* illegality. American does not deny that it has refused to allow McTravel to write tickets if it also advertises discounts. If this admitted policy is illegal *per se*, then the district judge surely abused her discretion in denying McTravel's request for preliminary relief. We therefore take up the argument that American's policy is unlawful *per se*. McTravel pursues its claim in three ways: arguing that *Dr. Miles* applies, that there was a conspiracy to evict McTravel from the market, and that American's program so obviously injures consumers that it should be deemed illegal *per se* even if *Dr. Miles* does not apply directly.

McTravel's principal argument is that *General Electric* died an unnatural death at the hands of *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). Before the case was argued, however, we concluded in *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430 (7th Cir.1986), that *General Electric* is healthy. Employment relations do not violate the antitrust

laws; Sears may tell the managers of its stores at what price to sell lawn mowers. *Morrison* held that genuine agency relations should be treated like employment relations. The owner of a house may tell the real estate agent the minimum price the owner will accept without committing a *per se* offense. What *Simpson* held, we concluded, is that a manufacturer may not avoid *Dr. Miles* by giving the name "agent" to one who serves the same economic functions as an ordinary wholesaler or retailer. The appropriate inquiry, according to *Morrison,* is "whether the agency relationship has a function other than to circumvent the rule against price fixing." 797 F.2d at 1436.

Counsel for McTravel conceded at oral argument that if this language in *Morrison* establishes the legal test, then it loses on its *per se* argument. The concession was well advised, because the district judge's thorough findings demonstrate that the relation is a genuine agency. Travel service operators do not resell air travel. We set out some of the district court's findings.

An air carrier establishes and announces to the public a price for its service. The airline determines the number and destination of flights and the equipment to be used on each. A traveler may reserve seats directly from the airline or through a travel agent; in either case the reservation is likely to be made on a computer that records the number of seats remaining on a flight and the price of each. The travel agent must obtain the airline's clearance (by computer) to book a flight. The agent does not purchase a seat for resale and does not hold an inventory of seats. (Some seats are purchased for resale, usually on charter flights but increasingly on other flights. We do not deal with seats purchased outright by travel service operators.) The airline or any agent in the country can sell the same seat. It remains available until reserved—and sometimes even after, for air carriers "overbook" to deal with no-shows. The traveler with a ticket goes to the airport and is served directly by the airline. If the traveler does not show up, the seat may fly empty and the airline loses the sale. (Some tickets have cancellation charges, a detail that does not affect the analysis.) The travel service operator takes no risk of unfilled seats or of the many problems, from mechanical difficulties to weather, that may make the airline unable to deliver transportation as promised. The airline takes all credit risks on the credit cards it accepts. True, as McTravel argues, the travel agent loses its commission when the traveler does not show and has his ticket refunded, but this is true of any agent when a sale falls through. The relation of travel agent to airline is not substantially different from the relation of broker to real estate owner, of brokerage house to investor, or of travel agent to hotel, rental car company, or other provider of travel services.

The district court concluded from these facts that travel service operators are genuine agents within the meaning of *General Electric.* This conclusion is amply supported by the record. McTravel therefore sought at oral argument to persuade us to alter the standard articulated in *Morrison.* It contended that the standard makes liability turn on the intent of the parties adopting the arrangement. Counsel accurately observed that this court has been skeptical about "intent" tests in antitrust law. E.g., *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 379–80 (7th Cir.1986); *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,* 784 F.2d 1325, 1338–39 (7th Cir.1986). See also VII P. Areeda, *Antritrust Law* ¶ 1506 (1986). Intent is a slippery issue, because firms may "intend" to harm rivals or acquire monopolies even though their practices, objectively viewed, are beneficial to consumers, "whose interests the [Sherman Act] was especially intended to serve". *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 15, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2 (1984). We do not believe, however, that the standard in *Morrison* requires reference to the mental states of the parties. "[T]he agency relationship has a function other than to circumvent the rule

against price fixing" (797 F.2d at 1436) when, objectively viewed, the arrangement serves one of the economic functions of agencies in general, such as apportioning risk to the firm best able to bear risk, or lodging pricing decisions in the firm best able to gauge market conditions. In *Morrison* itself the court found that a food broker is an agent because the principal is in the best position to evaluate market conditions and decide on an optimal selling strategy, 797 F.2d at 1437–38, not because of subjective intent. The same objective approach here supports the district judge's conclusion that McTravel is an agent of airlines and not a reseller. This means that the *per se* rule of *Dr. Miles* does not apply. (Of course, conclusions that depend on the record compiled so far might be altered if additional facts adduced at trial show that the district court has mischaracterized the nature of the relation between airlines and travel service operators. Here and elsewhere, we speak only of the conclusions drawn on the basis of the existing record.)

■ McTravel's second argument in support of *per se* treatment is based on horizontal collusion among dealers, usually a firm footing for *per se* analysis. McTravel contends that American conspired with other travel agents to cut off competition from an upstart with a novel way of doing business. (McTravel does not allege that there is a conspiracy among airlines.) We agree with the district court that American and its agents are not the same firm for purposes of *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Collaboration among dealers orchestrated through American therefore might establish a *per se* violation. The record does not contain an explicit agreement, however; it must be inferred, if it can be shown at all; the district court thought the evidence in support of such an inference "weak", and this is an appropriate characterization.

■ The Supreme Court held in *Monsanto* and reiterated in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), that to show conspiracy indirectly the plaintiff must demonstrate that the firm is behaving in a way that is inconsistent with unilateral decisionmaking. See also, e.g., *Garment District, Inc. v. Belk Stores Services, Inc.*, 799 F.2d 905, 908–11 (4th Cir.1986); *Souza v. Estate of Bishop*, 799 F.2d 1327, 1329–30 (9th Cir. 1986). This means showing that the defendant acted in a way that, but for a hypothesis of joint action, would not be in its own interest. See also *Morrison*, 797 F.2d at 1439–40; *Westman Commission Co. v. Hobart International, Inc.*, 796 F.2d 1216, 1222–25 (10th Cir.1986); *Business Electronics Corp. v. Sharp Electronics Corp.*, 780 F.2d 1212, 1217–18 (5th Cir. 1986); Liebeler, *Intrabrand "Cartels" Under* GTE Sylvania, 30 U.C.L.A.L.Rev. 1 (1982). If the evidence is consistent with the hypothesis that the firm at the top of the vertical chain designed the restrictions for its own purposes, an inference of conspiracy is inappropriate.

■ In any chain of distribution discussions of price will be frequent—and as *Monsanto* pointed out, beneficial too. 465 U.S. at 762–64, 104 S.Ct. at 1470–71. Concerns about free riding by discount travel agents, which we discuss below, may have led American to adopt its policy no matter what the agents thought or wanted. Consequently, it cannot be thought "clearly erroneous" for the district court to conclude that McTravel is unlikely to establish conspiracy here. Evidence that American discussed both price and McTravel with other agents does not support an inference of conspiracy. The usual "conspiracy" argument in a vertical restraints case is that the manufacturer is a cat's paw of "full price" retailers trying to maintain their prices. In this case, by contrast, McTravel complains that American has snubbed it in order to please other big discounters among its agents. There is no plausible anti-consumer reason why American would promote some discounters over another. The district court was entitled to think

McTravel unlikely to prevail, at least on the record developed so far.

Much of McTravel's remaining argument asks us to put aside formal labels and turn directly to what McTravel believes is the adverse effect of American's rule on consumers. This is the sort of short form or quick look Rule of Reason analysis endorsed in *NCAA v. Board of Regents*, 468 U.S. 85, 109–10 & n. 42, 104 S.Ct. 2948, 2965–66 & n. 42, 82 L.Ed.2d 70 (1984). See also VII Areeda at ¶ 1508. McTravel argues that American's demand that travel agents not advertise price reductions injures consumers by forcing them to pay higher prices. Because the antitrust laws are designed to assist consumers, see *Olympia Equipment,* 797 F.2d at 375 (collecting cases), *Westman Commission,* 796 F.2d at 1220, McTravel concludes that American's efforts to squelch the discounting should be forbidden.

■ This is a short-run view, however. Any form of vertical restraint affects prices, as the Supreme Court emphasized in *Monsanto.* The question is not whether the arrangement affects moment-to-moment rivalry in a way that raises today's prices, but whether this effect is associated with potential benefits to consumers that are worth the price. Higher quality may come with higher prices. The antitrust laws do not adopt a model of atomistic competition that condemns all organization; otherwise they would forbid Sears to tell the managers of its stores what prices to charge. Organization may be beneficial; there is little production in a world without organization. The question is how much organization is optimal from consumers' perspective, see *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210 (D.C.Cir.1986), and fixation on the short run effects on price is unlikely to yield a useful answer to such a complex question.

Both American Airlines and travel agents sell tickets for American's flights. American apparently wants all agents to charge the same price it does. A few years ago it abandoned efforts to enforce this rule, because agents were giving disguised discounts. They could, for example, sell a package of air travel and hotel space at a bargain, claiming that they had collected the full commission on the air travel but rebated the commission on the hotel room. (This illustrates how tie-in sales can be used to give secret discounts. See *Robert's Waikiki U–Drive, Inc. v. Budget Rent-A-Car Systems, Inc.,* 491 F.Supp. 1199 (D.Hawaii 1980), aff'd, 732 F.2d 1403 (9th Cir. 1984).) American then adopted its no-advertising rule, which is easily enforceable because advertising of discounts is observable. McTravel ran afoul of American's policy by advertising a fixed price for its services. It collects $8 for making a reservation and $7 for issuing a ticket, a total of $15 if the traveler uses both services. McTravel rebates to customers the difference between its price and the usual 10% commission. This will be attractive when the ticket's price exceeds $150.

The discount pricing structure supports McTravel's argument that it is doing a favor for consumers. But the question of characterization—whether for purposes of *per se* analysis or under the "quick look" version of the Rule of Reason—is not whether the plaintiff is a discounter. It is whether the practice at issue "facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" *Broadcast Music, Inc. v. CBS, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979), quoting from *United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978). Unless the practice "almost always" makes consumers worse off, it is not subject to condemnation without more detailed study of its effects—including proof of market power and actual injury. See *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 314–17 (8th Cir.1986).

*GTE Sylvania* observed that arrangements among firms in a vertical chain of supply often may be beneficial to consumers. 433 U.S. at 51–57, 97 S.Ct. at 2558–61. *Monsanto* also observed that price and non-price arrangements alike may produce these benefits. 465 U.S. at 762, 104 S.Ct. at 1470. Non-price arrangements, such as exclusive territories, may lead to higher prices; price arrangements, such as setting an agent's price, may induce agents to supply extra services that consumers desire. Non-price arrangements now are judged under the Rule of Reason. If there is no inevitable difference between price and non-price rules—if there is not, indeed, even a bright line separating the two, as this case shows in treating an advertising rule as a price rule, and see, e.g., *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 706–07 (7th Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984); *Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc.*, 572 F.2d 883, 885–86 (1st Cir.), *cert. denied*, 439 U.S. 833, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978); Liebeler, *1983 Economic Review of Antitrust Developments: The Distinction Between Price and Nonprice Distribution Restrictions*, 31 U.C.L.A.L.Rev. 384 (1983)—then there is no good argument for expanding either the *per se* rule or a summary version of the Rule of Reason to additional forms of vertical arrangement, as McTravel wishes us to do. *Dr. Miles* is not the model for the classification of new business arrangements.

■ American's prohibition of McTravel's price advertising does not call for summary condemnation at the preliminary injunction stage of this litigation. It does not "always or almost always" work to consumers' detriment. American has no particular reason to cram unwanted money down the throats of travel agents. If travel agents are charging too much for their services, why does American not reduce the commission and thereby angle for passengers with lower net prices at no cost to itself? It must be purchasing some sort of valuable service from these travel agents. Many thoughtful people believe that vertical restraints are as a rule beneficial to consumers and ought not be condemned lightly or ever. E.g., Bork, *Vertical Restraints:* Schwinn *Overruled*, 1977 Sup.Ct. Rev. 171; Butler & Baysinger, *Vertical Restraints of Trade as Contractual Integration*, 32 Emory L.J. 1009 (1983); Hay, *Vertical Restraints After* Monsanto, 66 Cornell L.Rev. 418 (1985); Liebeler, *1983 Economic Review, supra;* Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 U.Chi.L.Rev. 6 (1981); Telser, *Why Should Manufacturers Want Fair Trade?*, 3 J.L. & Econ. 86 (1960). The Supreme Court was receptive to such thoughts in *GTE Sylvania, Monsanto*, and *Rice v. Norman Williams Co.*, 458 U.S. 654, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982). When a new vertical restraint comes before a court, then, the appropriate response is not automatic condemnation but consideration whether the practice has a potential for harm (which includes an inquiry into market power) and, if there is such a potential, whether there are also potential benefits for consumers. See *Rothery Storage* and *Westman Commission*, among the many recent cases in other circuits adopting this approach. See also *Business Electronics*, 780 F.2d at 1221–22 (Jones, J., concurring).

American has raised some potential benefits of its practices. It has expressed concern about free riding by discount agents on the work of other agents or American itself. See *GTE Sylvania*, 433 U.S. at 53–57, 97 S.Ct. at 2559–61, and *Monsanto*, 465 U.S. at 762–63, 104 S.Ct. at 1470. Some agents may offer thorough counselling to travelers, and American offers an information and reservations service by phone and at offices in large cities. Travelers might frequent these full-service agencies, make reservations, and then pick up their tickets at McTravel for 90% of the price plus $7. The siphoning of business would prevent full-service agents, and American itself, from recovering the costs of what may be an expensive process of giving advice and making the reservation. (McTravel itself

believes that the cost to make a reservation is $8, and agencies that do more may incur higher costs.) If McTravel cannot draw attention to its unbundled prices—or if all agents charge the same price—then agents may compete for business by offering better service. Customers who use American's (or a given agent's) reservation service have no incentive to go elsewhere to pick up their tickets; American and its agents therefore are compensated for their services and will provide the level of service that travelers prefer. See *Westman Commission*, 796 F.2d at 1226–27.

This explanation shows that American's rule may be beneficial to customers. That is enough to establish that summary denunciation is inappropriate. If we were to bring this agency relation within the scope of a bobtailed *per se* rule, the effect would be the same as if *Simpson* had indeed overruled *General Electric.* Courts have long believed that once a relationship is a *genuine* agency, the manufacturer or supplier has the same uninhibited power to set the agent's price that he has to set the price to be charged by an employee. An appeal from the denial of a preliminary injunction is not the time to upset this long-held position.

We emphasize once more the narrow scope of our review. The district court has not found that American's practices are beneficial to consumers or are lawful; neither do we. There has not been a trial, and the district judge has not made findings on the subject. It is not appropriate to foreclose an argument that American could have made less restrictive arrangements. It might, for example, unbundle its prices. American could reduce to (say) $7 the commission it pays to an agent that does nothing but issue a ticket against a reservation made by someone else. On the other hand, this might complicate the reservations system, requiring separate computer entries for the reserving agent and the issuing agent. Whether unbundling is cost-justified ordinarily is a matter to be determined by competition in the market, not by judges.

We do not imply that defendants must justify their conduct; to the contrary, plaintiffs in antitrust, as in other parts of the law, bear an initial burden of showing that the conduct in question is probably harmful. Only then need the defendant supply a justification. *Rothery Storage,* 792 F.2d at 229 n. 11. When the arrangement in question is a traditional one such as employment or agency, that burden is particularly steep. Perhaps price arrangements in agency relations are best deemed lawful *per se,* as employment arrangements are and as courts have assumed to date is the inevitable effect of a finding of agency. We need not pursue the possibility. Our point is that so far McTravel has not reached first base. The district court was therefore entitled to find that McTravel's chances of success on the merits are slight.

This conclusion means that we can follow the district court's example and discuss irreparable injury only briefly. American's market share of air transportation is less than 15%. United, which carries 16% of the nation's air traffic, does not prohibit advertising of discounts. So far as the record shows, most of the industry follows United rather than American. Texas Air (Continental, Eastern, New York Air), which just became the largest carrier at 17%, is an aggressive price cutter. Agents and customers therefore are not at American's mercy—or so the district judge was entitled to conclude. Although McTravel argues that American's share of traffic at Chicago exceeds 20% and that an agent must be able to write tickets for all carriers to be successful, which magnifies American's market power and the irreparable injury, the record does not show how McTravel has done without being able to write for American. Perhaps its unusual method of setting prices will attract business and overcome the disadvantage of limited agency. The district judge thought this a possibility, and we defer to her judgment in assessing such matters at the preliminary injunction stage. See *Lawson Products,* 782 F.2d at 1433–34; *American*

*Hospital,* 780 F.2d at 593–94; see also *Ball Memorial Hospital,* 784 F.2d at 1333–34. It is enough for now that we concur in the district court's conclusion that McTravel is unlikely to prevail on the merits. That supports the denial of a preliminary injunction. Whether American has market power and whether the anti-ad rule harms consumers by restricting output are questions for the district court in any further proceedings that may be appropriate under the Rule of Reason.

AFFIRMED

FLAUM, Circuit Judge, concurring in the judgment.

The role of a circuit court reviewing the denial of a preliminary injunction is limited. The reviewing court is to determine whether or not the court below abused its discretion in declining to issue the injunction. *See Lawson Products v. Avnet,* 782 F.2d 1429, 1438 (7th Cir.1986); *American Hospital Supply v. Hospital Products,* 780 F.2d 589, 594 (7th Cir.1986). While the majority notes the limits that should constrain its review, I am compelled to conclude that its opinion goes beyond the limits with which it seeks to comply. I also write separately because the majority advances views, which we are not called upon to offer, that appear to conflict with current decisions of the Supreme Court. Therefore, I respectfully cannot join in its opinion.

The majority focuses on the merits of McTravel's claim. That emphasis, I believe, is not required. In reviewing a denial of a preliminary injunction, this court must make three determinations. First, we must determine whether the district court employed the correct preliminary injunction standard. Second, we must review whether in deciding the "threshold" questions— the adequacy of the movant's remedy at law, the danger of irreparable harm, and the existence of some likelihood that the movant will succeed on the merits—the trial court made correct legal determinations and factual findings that were not clearly erroneous. Finally, we must consider whether the district court abused its broad, equitable discretion in its weighing and balancing of the relevant factors. *See Lawson,* 782 F.2d at 1433, 1436–39.

The district court found that McTravel had met its threshold burden of demonstrating that it had some possibility of succeeding on the merits. *Illinois Corporate Travel v. American Airlines,* No. 85 C 07079, slip op. at 19 (N.D.Ill. Sept. 16, 1985) [Available on WESTLAW, DCTU database] (Memorandum and Order). This was easily done. All McTravel needed to do was to prove that its " 'chances [were] better than negligible,' " *Roland Machinery v. Dresser Industries,* 749 F.2d 380, 387 (7th Cir.1984) (citation omitted). Notwithstanding its finding that McTravel had met its threshold burden, the district court declined to issue the preliminary injunction. This was because the court found that McTravel had not demonstrated that irreparable harm would result without the injunction, *Illinois Corporate Travel,* slip op. at 22, and because the court concluded that the balance of the equities weighed in American's favor, *id.* at 19–21.

Had the district court declined to issue the injunction because it believed that McTravel had shown *no* possibility of success on the merits, the majority's detailed assessment of the merits might be appropriate. However, because the court found for the plaintiff on the issue of possible success, our review should focus on the issues that made a difference—the court's evaluation of irreparable harm and its balancing of the equities.

The majority uses the correct approach in assessing the district court's finding of no irreparable harm. *See supra* at 729. That finding, standing alone, is enough to uphold the decision of the court below. *See Lawson,* 782 F.2d at 1443.

I do not agree with the majority's approach to reviewing the balance of the equities. The majority states that if American's policy "is illegal per se, then the district judge surely abused her discretion in denying McTravel's request for preliminary relief." *Supra* at 724. The majority

uses this observation as a vehicle for its detailed consideration of the strength of McTravel's claims. We have made clear previously that "the ultimate evaluation and balancing of the equitable factors is a highly discretionary decision and one to which this court must give substantial deference." *Lawson,* 782 F.2d at 1437. Consequently, our review of a trial court's use of its equitable discretion will normally not provide justification for this court to review the entire spectrum of contested issues raised by a plaintiff's complaint.

We will have ample opportunity to review the factual and legal issues in this case if it comes to us on appeal following a final order. At that point we will have the benefit of a complete record and the full input of opposing counsel. *See Thornburgh v. American College of Obstetricians,* — U.S. —, 106 S.Ct. 2169, 2176–77, 90 L.Ed.2d 779 (1986) ("[A] court of appeals ordinarily will limit its review [of the denial of a preliminary injunction] to abuse of discretion" except where the legal issues are "clear" and "the facts are established or of no controlling relevance.").

In light of the above, it would be inappropriate for me to engage in a protracted discussion of the merits of the plaintiff's claims. However, I must express reservation about the majority's suggestion, although only *dicta,* that the alleged vertical price restraint at issue here is to be evaluated under a Rule of Reason standard. This issue, it should be noted, was not discussed by the parties in their briefs or at oral argument. The Supreme Court has recently reconsidered, and refused to abandon, its position that resale price maintenance should be judged under a *per se* standard. *See Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 761 n. 7, 104 S.Ct. 1464, 1469 n. 7, 79 L.Ed.2d 755 (1984); *Continental T.V. v. GTE Sylvania,*

433 U.S. 36, 51 n. 18, 97 S.Ct. 2549, 2558 n. 18, 53 L.Ed.2d 568 (1977). The Court may alter its view in the future. However, until it does, we are not free to depart from long-standing precedent.

Turning, briefly, to the issues actually before us on this appeal, it is not entirely clear from the record produced below that the district court applied the appropriate preliminary injunction standard.[1] Nonetheless, I conclude that, as a matter of law, the district court was correct in concluding that the plaintiff had some possibility of succeeding on the merits and that it did not abuse its broad discretion in its balancing of the equities between the parties. For that reason, I concur in the judgment of the court.

---

**1.** The district court may have interpreted our cases to require that it reach its decision solely by determining whether McTravel's probability of success balanced against the harm it would suffer if the court denied the injunction exceeded American's probability of success balanced against the harm that it would suffer were the injunction granted. While a district court has discretion to consider these factors as part of its effort to weigh the equities, it is not required to do so. This circuit continues to adhere to the traditional equitable doctrines governing preliminary injunctions. We have not adopted "a new legal standard ... intended ... to force analysis into a quantitative straight jacket," *American Hospital Supply,* 780 F.2d at 593.