**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VALUEPEST.COM OF CHARLOTTE,
INCORPORATED, formerly known as
Budget Pest Prevention,
Incorporated; NATIONAL PEST
CONTROL, INCORPORATED; PEST
PROS, INCORPORATED, individually
and on behalf of persons similarly
situated,

        *Plaintiffs-Appellants,*

        v.

BAYER CORPORATION; BAYER
CROPSCIENCE LP; BASF
CORPORATION,

        *Defendants-Appellees,*

        and

ORKIN, INCORPORATED; THE
TERMINIX INTERNATIONAL COMPANY
LIMITED PARTNERSHIP,

        *Defendants.*

No. 07-1760

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(1:05-cv-00090-LHT)

Argued: January 29, 2009

Decided: March 24, 2009

Before WILKINSON, TRAXLER, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Traxler and Judge Shedd joined.

---

**COUNSEL**

**ARGUED:** David Barry, BARRY & ASSOCIATES, San Francisco, California, for Appellants. Glen David Nager, JONES DAY, Washington, D.C., for Appellees. **ON BRIEF:** Michael D. Bland, Benjamin L. Worley, WEAVER, BENNETT & BLAND, P.A., Matthews, North Carolina; Forrest A. Ferrell, Warren A. Hutton, SIGMON, CLARK, MACKIE, HUTTON, HANVEY & FERRELL, P.A., Hickory, North Carolina, for Appellants. Larry S. McDevitt, VAN WINKLE, BUCK, WALL, STARNES AND DAVIS, P.A., Asheville, North Carolina; Lawrence D. Rosenberg, JONES DAY, Washington, D.C.; George T. Manning, JONES DAY, Atlanta, Georgia, for Appellees Bayer Corporation and Bayer CropScience LP. Douglas W. Ey, Jr., Catherine E. Thompson, William C. Mayberry, Jason D. Evans, HELMS, MULLIS & WICKER, P.L.L.C., Charlotte, North Carolina, for Appellee BASF Corporation.

---

**OPINION**

WILKINSON, Circuit Judge:

In this Sherman Act suit, plaintiffs, who provide pest control services to individual customers, allege that defendants, who manufacture pesticides, illegally conspired with their distributors to set minimum resale prices of certain termiticide

products. Specifically, plaintiffs claim that defendant manufacturers Bayer CropScience LP and Bayer Corp. (hereinafter collectively referred to as "Bayer") and BASF Corp. each engaged in the practice known as "resale price maintenance" or "vertical price fixing"—Bayer with its product Premise and BASF with its product Termidor. Defendants counter that *United States v. General Electric Co.*, 272 U.S. 476 (1926), held that a manufacturer may lawfully set minimum prices for its products when there is a genuine principal-agent relationship between the manufacturer and its distributors, and that such relationships existed here. Plaintiffs rejoin that *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007), implicitly overruled *General Electric*, and in the alternative argue that the agency relationships between defendants and their distributors were a sham. Because *Leegin* did not eliminate the agency defense to a claim of resale price maintenance and the agency relationships between defendants and their distributors were genuine, we find no basis for antitrust liability and thus affirm the district court's grant of summary judgment to defendants.

I.

In 1996, Bayer introduced Premise, a termiticide that uses the active ingredient imidacloprid. Premise is a liquid "non-repellent" termiticide. Prior to Premise's arrival to the market, the only liquid termiticides were repellents, which create a chemical barrier around a house or other structure that prevents termites from entering. Non-repellent termiticides are similarly used to create a barrier around a structure, but do not repel termites; instead, the barrier they create is poisonous to termites that pass through it. The poison does not kill the termites immediately. Termites carry it back to their nests and likely spread it to the entire colony. Non-repellents are highly efficacious and have steadily grown in market share since their introduction.

Bayer initially sold its Premise products to the distributors of its other pesticide products. One of those distributors is a

company now known as Univar USA, Inc., which is one of the nation's largest distributors of termiticides to pest management professionals ("PMPs"), who provide pest control services to homeowners and other individual customers. Univar and other distributors then resold the products to PMPs such as plaintiffs Valuepest.com of Charlotte, Inc. (formerly Budget Pest Prevention, Inc. and hereinafter "Valuepest"), National Pest Control, Inc., and Pest Pros, Inc. This arrangement continued for several years.

Then, in 2000, Aventis CropScience, L.P. began selling Termidor, a new non-repellent termiticide using the active ingredient fipronil. In early 2000, Aventis began selling Termidor directly to a select group of 200 PMPs, which was expanded to a group of 400 in July. In September of 2000, however, Aventis began distributing Termidor through Univar and other distributors pursuant to non-exclusive agency agreements. The agency agreements provided that Aventis was the seller of Termidor to PMPs, while the distributor-agent merely facilitated that transaction. Further, the agreements specified that Aventis retained title to the Termidor until it was sold to a PMP. The agents received commissions for the sales they facilitated. The agency arrangement allowed Aventis to set the price at which Termidor was sold to PMPs.

According to Bayer, after experiencing the benefits of the Termidor agency arrangement, some distributors became unhappy with the distribution arrangement for Premise. The agency contracts were more profitable to distributors than the previous distribution arrangement, in which the distributors purchased Premise from Bayer and resold it to PMPs. Bayer, dependent on its distributors for marketing, became concerned about losing sales if distributors chose to encourage PMPs to purchase Termidor instead of Premise—which the distributors had every incentive to do, given that they made more money selling Termidor.

Thus, in January of 2001 Bayer began selling Premise through an agency program similar to that used by Aventis.

Bayer continued to use its old distributors, but whereas before the distributors had purchased the product from Bayer, the new agency agreements stated that Bayer would retain title to the Premise until it was sold to a PMP. The agreements further specified that Bayer would set the retail prices and that the distributors would receive a fixed commission for each sale.

In October of 2001, Bayer's and Aventis's respective boards of directors announced a plan in which Bayer would purchase all shares of Aventis. An investigation by the Federal Trade Commission ("FTC") ensued. The FTC approved the acquisition, which was completed in June of 2002, but required that Bayer divest assets relating to fipronil, Termidor's active ingredient. BASF acquired the fipronil assets from Bayer on March 21, 2003, and since that date has manufactured and sold Termidor in the United States. BASF became the assignee of the earlier agency contracts for Termidor, and continues to sell Termidor using agency agreements. Bayer ceased selling Premise via agency contracts in 2005.

On April 25, 2005, Valuepest filed a class action lawsuit in the United States District Court for the Western District of North Carolina, alleging vertical price fixing by Bayer, BASF, and other defendants in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The complaint was amended three times, adding and then dropping a claim, dismissing defendants other than Bayer and BASF, and adding National Pest Control and Pest Pros as plaintiffs and proposed class representatives.

On November 21, 2006, plaintiffs and defendants each filed motions for summary judgment; plaintiffs also filed a petition for class certification.[1] While the district court was consider-

---

[1]The parties agreed that the district court would resolve first the vertical price fixing claims with respect to only one of Bayer's and BASF's distributors, Univar, and that the court's resolution of the claims regarding

ing these motions, the Supreme Court held argument in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007). The district court issued an order stating it would wait to rule on plaintiffs' summary judgment motion until after *Leegin* was decided, but would continue consideration of defendants' motions. Two weeks after the Supreme Court handed down its decision in *Leegin*, the district court granted summary judgment for defendants on the ground that defendants' contracts with their distributors represented genuine agency relationships that did not support liability under § 1. The court also denied plaintiffs' motion for class certification as moot. Plaintiffs now appeal.

## II.

Plaintiffs insist in their briefs and at oral argument that after *Leegin* the agency defense under *General Electric* to a claim of resale price maintenance is no longer viable. This argument fails because the two cases dealt with two separate elements of antitrust liability: *General Electric* addressed what types of relationships constitute agreements to set prices for purposes of the Sherman Act, while *Leegin* concerned whether such agreements, once proven, should be considered *per se* unlawful or evaluated for their reasonableness. The structure of § 1 of the Sherman Act makes the different focus of the two decisions clear.

Section 1 forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. "Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,'" the Supreme Court has repeatedly made clear that "Congress intended to

Univar would "set the framework for resolution of Plaintiffs' claims against Defendants with regard to all of their individual distributors." J.A. 430. Accordingly, in our subsequent analysis of the claims we discuss only the facts related to the agreements with Univar.

outlaw only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Showing a violation of § 1 thus requires proof of two elements: "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).

The first element requires proof of some kind of agreement, for "[i]ndependent action is not proscribed." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Plaintiffs must provide "evidence of a relationship between at least two legally distinct persons or entities." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) (en banc). Thus only alleged resale price maintenance that actually involves an agreement between two parties comes within the scope of § 1. Prohibited resale price maintenance is the practice by which a manufacturer and a distributor agree on a minimum price below which the distributor will not sell the manufacturer's products. *See* 8 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* 206-07 (2d ed. 2004). Unilateral action by a manufacturer does not suffice to implicate § 1; a manufacturer can, for example, refuse to sell to retailers who resell its products for less than the manufacturer's preferred price. *See United States v. Colgate & Co.*, 250 U.S. 300 (1919).

In *General Electric*, the Court addressed an allegation of resale price maintenance by a lamp manufacturer and its network of distributors. The defendant claimed "that its distributors were *bona fide* agents," while the government contended that "the system of distribution adopted was merely a device to enable the [defendant] to fix the resale prices of lamps in the hands of purchasers," and "that the so-called agents were in fact wholesale and retail merchants." *Gen. Elec.*, 272 U.S. at 479. After examining the terms of the contracts between the defendant and its distributors, the Court determined that the distributors were genuinely the manufacturer's agents, and

that therefore the scheme did not violate the Sherman Act. *See id.* at 484-88.

The Court reasoned that a manufacturer has the right to sell its products on whatever terms it wishes; it is only when the manufacturer "adopts a combination with others" that the Sherman Act is implicated. *Id.* at 485. Because the Court found that General Electric was indeed selling its lamps directly to consumers via its agents, rather than selling them to the retailers and requiring the retailers to resell them at a fixed price, the defendant was not guilty of unlawful vertical price fixing. *General Electric* thus concerned what facts sufficed in resale price maintenance claims to prove the first element of § 1 liability—whether a "contract, combination," or "conspiracy" existed. 15 U.S.C. § 1.

As a general matter, to support liability an agreement must also satisfy the second element of § 1: it must be an unreasonable restraint on trade. *See Dickson*, 309 F.3d at 202. Under the longstanding precedent of *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911), resale price maintenance agreements were considered *per se* unlawful, and plaintiffs who could prove that such an agreement existed did not need to adduce further proof that the agreement unreasonably restrained trade. *Dr. Miles* remained the law for nearly a century until 2007, when it was overruled by the Supreme Court in *Leegin*. In that case, the Court abolished the *per se* rule against resale price maintenance and held that "[v]ertical price restraints are to be judged according to the rule of reason." *Leegin*, 127 S. Ct. at 2725.

Under the rule of reason, a factfinder examines all of the circumstances to determine whether a practice unreasonably restrains competition. *Id.* at 2712. Factors that should be considered "include 'specific information about the relevant business' and 'the restraint's history, nature, and effect,'" *id.* (quoting *Khan*, 522 U.S. at 10), as well as "[w]hether the businesses involved have market power," *id.* (citing *Copper-*

*weld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). The Court rejected the *per se* rule of *Dr. Miles* as excessively formalistic and not sufficiently grounded in the actual economic impact of vertical price restraints. *Id.* at 2714. The Court looked to a growing consensus in economic theory that vertical pricing agreements, while sometimes anti-competitive, can often have procompetitive effects. *Id.* at 2714-16 (detailing how resale price maintenance can promote interbrand competition by encouraging retailers to invest in promotional efforts, giving customers a range of options including "low-price, low-service brands" and "high-price, high-service brands," and by facilitating market entry for new products).

Plaintiffs contend that *Leegin* overruled *General Electric* and replaced it with a generalized inquiry into market power and procompetitive benefits even where a genuine agency relationship exists. The foregoing analysis of § 1's structure should make clear why this assertion must be rejected. Plaintiffs' argument conflates the distinction between the two elements required to prove liability under § 1. *General Electric* concerned the first necessary element of § 1 liability—the existence of an agreement. Where a manufacturer sells its products through its genuine agents, there is no "contract, combination" or "conspiracy," and thus no basis for antitrust liability. 15 U.S.C. § 1. At issue in *Leegin* was an entirely different question regarding the second element of § 1 liability that applies when an agreement has been proven: should that agreement be considered *per se* unlawful or should it be analyzed under the rule of reason? The two cases dealt with separate and distinct issues, and thus no part of *Leegin*'s reasoning casts the slightest bit of doubt on the underpinnings of the rule of *General Electric*.

Furthermore, *Leegin* never once mentioned or cited *General Electric*. The Court has made clear that it "does not normally overturn . . . earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000).

It would be especially odd for the Court to have overruled *General Electric* by implication given that the Court spent several pages of its decision in *Leegin* explicitly analyzing whether *stare decisis* required adherence to *Dr. Miles*. *See Leegin*, 127 S. Ct. at 2720-25. If the Court had thought that overruling *Dr. Miles* would simultaneously overrule another venerable antitrust precedent, it surely would have said so.

Quite simply, *Leegin* has no bearing on the continued vitality of *General Electric*, and plaintiffs' argument to the contrary cannot stand. The two holdings stand independently of each other. *General Electric* holds that a principal-agent relationship is not an agreement for antitrust purposes, while *Leegin* only addressed the circumstances under which an agreement proven to exist is reasonable under § 1. *Leegin* thus is only relevant if plaintiffs can prove the agency relationships claimed by defendants were a sham. We must thus determine whether the agreements between defendants and Univar were genuine agency relationships under *General Electric*.

III.

It is important at the outset to note why principal-agency agreements are important. The owner of a good may generally set the price at which the good is sold. If one of the benefits of manufacturing a good is to set the price by which it is sold, then it is only sensible not to deprive the manufacturer of its right if, for reasons of efficiency, it chooses to use agents that are loyal to it rather than employees. "Employment relations do not violate the antitrust laws." *Ill. Corporate Travel, Inc. v. Am. Airlines, Inc.*, 806 F.2d 722, 724-25 (7th Cir. 1986). The cases refusing to extend § 1 liability to genuine agency relationships are premised on the idea that such relationships "should be treated like employment relations." *Id.* at 725; *see also Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

Several factors are important in our evaluation of the relationships at issue here. Once again, *General Electric* is

instructive. General Electric sold its lamps to consumers via a consignment arrangement with retail and wholesale merchants. *Gen. Elec.*, 272 U.S. at 481-83. Prices were set by GE, and the dealers received fixed commissions. *Id.* GE retained title to the lamps in the possession of the agents until they were sold to actual consumers. *Id.* at 482. The manufacturer also assumed the risk of loss from fire, flood, obsolescence, and price decline, paid the taxes on the lamps, and carried insurance on the stock. *Id.* at 483. The agents were required to pay for all expenses related to storage, transportation, sale, and distribution of the lamps, and were responsible for lamps lost or damaged while in the agent's care. *Id.* at 482-83. The agents collected payments from customers and remitted the proceeds to the manufacturer, less their commission. *Id.* at 482.

After reviewing the details of the arrangement, the Court found "nothing in the form of the contracts and the practice under them" that made the distributors "anything more than genuine agents of the company." *Id.* at 484. The Court stressed several facts, including that the agents were not required to pay for the lamps until they had been sold to customers and that the title of the lamps passed directly from the manufacturer to the consumer at the time of sale. *Id.* The Court did not find the agents' obligations to pay for lost or damaged lamps or to pay for storage, transportation, sale, and distribution expenses inconsistent with a genuine agency relationship. *Id.* Nor did the "circumstance that the agents were in their regular business wholesale or retail merchants, and under a prior arrangement had bought the lamps, and sold them as their owners" preclude GE from changing the relationship to one of genuine agency. *Id.* at 484-85.

The Court's other major case on the agency defense to a claim of resale price maintenance is *Simpson v. Union Oil Co. of California*, 377 U.S. 13 (1963). At issue in that case was an oil company's scheme to set the retail price of its gasoline sold to customers by gas stations. Under the purported con-

signment agreement, retailers received commissions on gasoline sold, and the title to the consigned gasoline passed directly from the oil company to the consumer at the time of sale. *Id.* at 15. The oil company paid property taxes on the gasoline held by the retailers, but the retailers were required to carry personal liability and property damage insurance and were responsible for virtually all losses of the gasoline in their possession. *Id.*

The Court held that the arrangement constituted unlawful resale price maintenance. *Id.* at 24. It observed that the dealers were "independent businessmen" possessing "all or most of the indicia of entrepreneurs, except for price fixing." *Id.* at 20. The Court acknowledged that consignment is a legitimate method for an owner to sell his property. *Id.* at 21. But it looked beyond the agreements' form to consider their substance, and concluded they were precisely the kind of price-fixing arrangement that § 1 was meant to prevent. *Id.* at 24. "To allow Union Oil to achieve price fixing in this vast distribution system through this 'consignment' device would be to make legality for antitrust purposes turn on clever draftsmanship," the Court reasoned. *Id.*

The Court conceded that the agreement upheld in *General Electric* "somewhat parallels the one in the instant case." *Id.* at 22-23. The Court distinguished *General Electric* on the ground that that case concerned patented articles, and found its holding "not apposite to the special facts here." *Id.* at 23. In dissent, Justice Stewart called the Court's ground for distinguishing *General Electric* "specious," for the *General Electric* Court "gave no intimation whatsoever that its conclusion would have differed in any respect if the consigned article had been unpatented." *Id.* at 27-28 (Stewart, J., dissenting).

Some subsequent commentators have agreed with Justice Stewart that the holdings in *General Electric* and *Simpson* are irreconcilable. *See, e.g.*, Terry Calvani & Andrew G. Berg, *Resale Price Maintenance after Monsanto: A Doctrine Still at*

*War with Itself*, 1984 Duke L.J. 1163, 1178. However, "courts generally have not interpreted *Simpson* as a blanket condemnation of all consignment agreements in which the manufacturer/supplier sets retail prices." *Hardwick v. Nu-Way Oil Co.*, 589 F.2d 806, 809 (5th Cir. 1979). Nor should they have. It cannot "seriously be argued that the ancient and ubiquitous practice of principals' telling their agents what price to charge the consumer is just some massive evasion of the rule against price fixing." *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1437 (7th Cir. 1986). Otherwise, perverse results would obtain—such as a homeowner being guilty of violating § 1 "when he tells his broker at what price to sell his home." *Id.* at 1436.

Instead, courts have read *Simpson* to require a careful inquiry into a purported agency agreement, in order to determine whether it is genuine or a sham. Courts must look "to the substance of the parties' dealings rather than merely to form." *Marty's Floor Covering Co. v. GAF Corp.*, 604 F.2d 266, 269 (4th Cir. 1979). In this inquiry, courts have considered most important how business risks were allocated between the parties. "If a distributor deals with his supplier as an 'independent businessman' who bears most or all of the risks on transactions with purchasers, then an agency or consignment agreement is ineffective to insulate the manufacturer from antitrust liability for fixing resale prices. However, where the manufacturer bears the financial risks of transactions with the customers . . . it is likely that the distributor is merely an agent for the manufacturer." *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1223 (8th Cir. 1987) (citations omitted); *see also Farm Stores, Inc. v. Texaco*, 763 F.2d 1335, 1344 (11th Cir. 1985); *Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 342-43 (9th Cir. 1983).

Looking to the distribution of business risks is sensible. If a manufacturer designates a distributor its agent yet insists that the distributor bear most or all of the traditional burdens of ownership, it is likely that the claimed agency relationship

is merely a "clever manipulation of words," *Simpson*, 377 U.S. at 22, and not a legitimate business arrangement that should be protected by law. On the other hand, when a manufacturer is willing to assume the burdens associated with ownership, it should be entitled to the benefits as well—including the right to sell its property through an agent. *See id.* at 21 ("[A]n owner of an article may send it to a dealer who may in turn undertake to sell it only at a price determined by the owner. There is nothing illegal about that arrangement.").

Courts also consider the economic justification offered for the agency agreement. The Seventh Circuit, noting the *Simpson* Court's concern that the oil company had merely evaded the rule against resale price maintenance by labeling its arrangement an agency relationship, held that in such cases courts should ask "whether the agency relationship has a function other than to circumvent the rule against price fixing." *Morrison*, 797 F.2d at 1436. As with the inquiry into the distribution of risks, considering economic justification helps distinguish between those arrangements that further the goal of antitrust law and those that subvert it. "The purpose of antitrust law, at least as articulated in the modern cases, is to protect the competitive process as a means of promoting economic efficiency." *Id.* at 1437. Agency relationships that have strong business justifications are the ones most likely to promote efficiency; those created merely to avoid antitrust scrutiny are the most likely to be inefficient and harmful to consumers.

Finally, courts look to whether the agency agreement is a product of coercion. *See, e.g.*, *Day*, 400 F.3d at 1278. The Court in *Simpson* was concerned that the defendant oil company exercised coercive power over the gasoline retailers, for the retailers depended entirely on the contracts with the oil company for their business. *See Simpson*, 377 U.S. at 21. With these factors in mind, we now turn to an examination of the "substance" of the relationships between defendants and Univar. *Marty's Floor Covering Co.*, 604 F.2d at 269.

IV.

A.

In examining Bayer's and BASF's contracts with Univar, the threshold question is which party bore the risk of loss. We find that this factor weighs in favor of a genuine agency relationship. First, as a formal matter, both Bayer and BASF retained title on their respective products while in Univar's possession, and the agreements specified that defendants, not Univar, bore the risk of loss on the termiticides until they were delivered into the hands of PMPs. While plaintiffs not surprisingly seek to dismiss the retention of title as a mere formality, such traditional incidents of property law, embodied here in the agency agreements, have real significance. And beyond the formal labels in the agreements, defendants also satisfied the standard in substance. They retained many of the burdens of ownership, indicating the agency relationships were authentic. The evidence strongly supports the conclusion that the risk of loss was borne by defendants.

A number of facts support the conclusion that defendants bore the risk of loss. The agreements required that Univar store defendants' termiticides separate from Univar's own property, and label the products as belonging to defendants. The agreements squarely placed the risk of economic loss due to nonpaying PMPs on defendants' shoulders. Both defendants' agreements set limits on the amounts of credit Univar could extend to purchasers, and required defendants, not Univar, to pursue delinquent purchasers. Under the contracts, defendants retained the right to audit Univar for compliance with the agency agreements; BASF, at least, audited Univar annually. Bayer's contract with Univar explicitly stated that Bayer would pay all property taxes on the Premise owned by Bayer.

Beyond the formal terms of the agreements, Bayer and BASF bore the risk of loss in practice as well. As the district

court concluded, "testimony from representatives of Bayer, BASF, and Univar . . . confirm that Bayer and BASF actually retain both title and the risk of loss on Premise or Termidor, respectively" until sold to PMPs. J.A. 449. When Termidor in Univar's possession was stolen on two occasions, BASF, not Univar, wrote off the losses. When Univar suffered a credit loss on a sale of Premise, Bayer reimbursed Univar. Invoices sent to PMPs buying Premise or Termidor stated that the products were owned by Bayer or BASF, not by Univar.

Plaintiffs' arguments that defendants did not actually bear the risk of loss are unavailing. They contend that the fact Univar was required to carry insurance against its own negligence is evidence that Univar bore the risk of physical loss, but it makes perfect sense for a principal to require a genuine agent to be responsible for the agent's own carelessness in order to discourage it. *See Day*, 400 F.3d at 1277. Plaintiffs point out that until recently both defendants failed to pay property taxes on their products held by Univar in a number of states. But Univar never paid property taxes on the termiticides either, and Bayer's agreement, at least, assigned this responsibility to Bayer, not Univar. Furthermore, BASF paid inventory taxes on its Termidor.

Plaintiffs claim that the fact that defendants' insurance deductibles for their termiticides are greater than the amount of product stored at any one Univar location means that Univar bore the risk of loss. This conclusion does not follow; simply because defendants have made the business decision not to insure against the loss of their products from Univar's locations does not mean that they do not bear the risk of that loss. Plaintiffs point out that Univar designed its accounting system so that Univar took title to the pesticides at the moment of sale. However, this bookkeeping method, utilized by Univar in order to minimize Univar's tax liability, was clearly inconsistent with the clear terms of the agency agreements, and, so far as the record shows, was not even known to defendants.

Plaintiffs argue that Univar bore the risks associated with PMPs paying Univar by credit card. To alight on such an accepted method of payment as material is grasping at straws. Moreover, according to the agreements Univar was not required to accept credit cards in the first place. That Univar chose to attract customers in this manner and increase its commission income under the agency arrangement does not prove that the relationship was anything other than genuine. *See Ill. Corporate Travel, Inc. v. Am. Airlines, Inc.*, 889 F.2d 751, 753 (7th Cir. 1989). Plaintiffs are apparently under the misapprehension that an agency relationship must be devoid of any indication of entrepreneurship on the part of the agents involved. This view simply overlooks the point that every business relationship, however characterized, will have some elements of enterprise. *Simpson* directed that courts should be wary of arrangements where the purported agent possesses "all or most of the indicia of entrepreneur[ship]," 377 U.S. at 20, but that is a far cry from saying that agents cannot have *any* of those attributes. The agent in a principal-agency relationship need be loyal, but not robotic.

Thus, we find that defendants, not Univar, bore the risk of loss of the termiticides—a factor which strongly supports a determination that Univar was a genuine agent of defendants. *See Ryko Mfg. Co.*, 823 F.2d at 1223. The other two significant factors also weigh in favor of a genuine agency relationship. We review each in turn.

First, the record indicates that defendants used the agency sales method for legitimate business reasons. When Aventis first launched Termidor, it chose to use the agency method in order to retain more control over how Termidor was sold to PMPs than would have been possible under a more traditional distribution arrangement. The company wanted Termidor to be seen as a premium product of high efficacy, and thus wanted to retain control over how the product was presented to PMPs. Further, because Termidor was an entirely new termiticide, the company wanted through its agents to restrict

sales to PMPs who had been trained how to use the product appropriately. Releasing a new product in a highly competitive marketplace is a difficult endeavor. In such a venture, the agency method can be useful because it enables a manufacturer to retain more control over how its product is marketed than it would if it merely sold the products to distributors. True resale price maintenance can usefully promote interbrand competition. *See Leegin*, 127 S. Ct. at 2714-16. Agency arrangements may likewise be suited to do so, given the greater control they give manufacturers over product presentation. The decision by Aventis, and later BASF, to use the agency method seems justified by sound business reasons.

Bayer, for its part, elected to switch to the agency sales method not out of a desire to fix prices, but because distributors preferred the agency method and the commissions they received from it to the traditional distribution method Bayer had been using. Bayer was forced to switch to the agency method in order to stay competitive. Certainly a desire to emulate a successful business model cannot be said to be an illegitimate business motive. Both defendants had legitimate business reasons for using the agency method.

Second, there is no evidence whatsoever that the agency agreements were the product of coercion. Unlike the gasoline retailers in *Simpson*, Univar was not dependent on the agency contracts for its livelihood; indeed, they constituted no more than a small fraction of its business. The record indicates that far from being compelled to adopt the agency sales method, distributors like Univar actually preferred it.

Thus, the factors courts consider when evaluating whether an agreement creates a genuine agency relationship militate in favor of finding that such a relationship existed here.

### B.

Notwithstanding the several factors that weigh in favor of a genuine agency relationship, plaintiffs make several addi-

tional arguments against that conclusion. First, plaintiffs argue that distributors like Univar could not be agents while serving Bayer and BASF simultaneously. This argument is premised on a misunderstanding of the agency method, in which nonexclusive relationships are common. In *Illinois Corporate Travel, Inc. v. American Airlines, Inc.*, 889 F.2d 751 (7th Cir. 1989), the Seventh Circuit held that a travel service operator was an airline's genuine agent notwithstanding the fact that the relationship was nonexclusive, for "this is a common form of organization. Real estate agents work for many clients, and multiple-listing services allow many agents access to the same properties; auction houses sell works of art furnished by hundreds of owners at a single sitting." *Id.* at 752-53. Plaintiffs cite no case for the proposition that only exclusive agency relationships are genuine for antitrust purposes.

Second, plaintiffs make a number of related arguments about actions taken by Univar that plaintiffs suggest should instead have been taken by defendants. For example, plaintiffs state that Univar, not defendants, took out pesticide licenses. They point out that Univar hired and fired employees and paid for workers' compensation insurance. Plaintiffs emphasize that Univar, not defendants, sent bills to PMPs. Plaintiffs also note that Univar remitted payment to defendants less its commission rather than being paid by defendants for services rendered. They draw attention to the fact that Univar, not defendants, dealt with expenses relating to its warehouses and paid for warehouse insurance.

These arguments ignore the reasons why a manufacturer would use sales agents in the first place. It is hardly surprising that many effective agents have experienced employees and tested business techniques of their own. Univar, as a distributor that already sold many companies' pesticides, had low overhead costs and was in a better position to make staffing decisions, deal with licensing requirements, bill customers, and maintain its warehouses than were defendants. It was rea-

sonable for defendants to leave those matters to the party best positioned to deal with them. Defendants chose to use Univar as an agent precisely because, with its robust pesticide distribution business, it was well-equipped to handle retail transactions more efficiently than could Bayer or BASF themselves. If the rule were otherwise—that is, if a manufacturer could not leave to an agent the responsibility for dealing with hiring employees and so on—there would be little reason for a manufacturer to use agents rather than employees. But "[e]fficiency would not be promoted by a rule that forbade principals to tell their agents at what price to sell the principal's product unless the agent was an employee." *Morrison*, 797 F.3d at 1437.

In sum, we find unconvincing plaintiffs' various arguments that the agency agreements at issue in this case were shams. Because the agency relationships between defendants and Univar were genuine, neither defendant violated § 1.[2]

V.

Section 1 of the Sherman Act and the Supreme Court's cases interpreting it attempt to strike a balance. The law must prevent agreements that undermine the principle of competition necessary to make a free market function. Yet if law sweepingly declares off-limits business methods that companies might opt to use for legitimate commercial reasons, consumers—the intended beneficiaries of antitrust law—are worse off. The Court's cases on resale price maintenance have walked this sensible path. Under *General Electric*, manufacturers can use the agency method to distribute their products. Yet under *Simpson*, a distribution method labeled "agency" but that in substance is simply an agreement between manufacturers and retailers to fix prices can create liability under

---

[2]Because we conclude that there was no substantive § 1 violation, we need not reach defendants' argument that plaintiffs failed to prove injury as required by § 4 of the Clayton Act, 15 U.S.C. § 15.

§ 1. Here we are persuaded that the relationships at issue stand comfortably on the *General Electric* side of the line. Because the agency contracts are legitimate business arrangements, and not unreasonable restraints on trade creating potential § 1 liability, the judgment is affirmed.

*AFFIRMED*